STATE OF VERMONT
SUPERIOR COURT — ENVIRONMENTAL DIVISION

|  | } |  |
|---|---|---|
| In re Group Five Investments, LLC | } | Docket No. 34-3-11 Vtec |
| Conditional Use Application | } | (Appeal from Ferrisburgh ZBA |
|  | } | approval of application #10-92) |
|  | } |  |

## Amended Decision on the Merits[1]

Group Five Investments, LLC ("Applicant") seeks a municipal permit to construct and operate a retail facility on property located on the easterly side of U.S. Route 7 in the Town of Ferrisburgh ("Town"). The project site is located in the most southern of three Highway/Commercial Zoning Districts along Route 7 and near the boundaries with the neighboring towns of Monkton to the east, Vergennes to the west, and Waltham to the south.

Additional parties to this appeal include fifteen individuals[2] who we collectively refer to as "Appellants." The Town also appeared in these proceedings but decided not to play an active role at trial. Applicant is represented by David Greenberg, Esq.; Appellants are represented by James A. Dumont, Esq.; and the Town is represented by James F. Carroll, Esq. When the parties were unable, despite best efforts, to reach a voluntary resolution of all outstanding disputes concerning the proposed project, the Court conducted a site visit and a multi-day merits hearing.

Based upon the evidence presented to this Court at its multi-day merits hearing, including that evidence which was put into context by the site visit the Court conducted with the parties, the Court makes the following Findings of Fact and Conclusions of Law. A Judgment Order accompanies this Decision.

### Findings of Fact

#### I.     The Project and its Site

1.     The project site is on a parcel of land, currently undeveloped, at the southeastern corner of the intersection of Monkton Road and Vermont Route 7, which is about three miles south of

---

[1]  Pages 10–13 of this Decision have been altered to reflect our corrected application of the law, in response to Appellant's November 1, 2012 motion pursuant to V.R.C.P. 52 & 59.

[2]  Those fifteen individuals are Gary Lange, Elias Baldwin, Judy Chaves, Judy Elson, Greg and Mary Beth Hamilton, Amanda Hodson, Krista MacKulin, Theresa Matlock, Liz and Peter Markowski, Eric McEntee, Tim Hodson, Nick Patch, and Martha Redpath.

the Town village center area. The site contains 9.9± acres and is situated in the southernmost of three Highway/Commercial Zoning Districts in the Town. All three of the Highway/Commercial Zoning Districts are located along Route 7, which traverses the Town in a north-south manner.

2. The project site has frontage on both Monkton Road and Route 7. The land is initially level with the road shoulders, but then slopes inward, thereby making the area to be developed lower in grade than the adjoining town and state highways.

3. Applicant proposes to construct a commercial structure that would include about 10,640 square feet of interior space, which Applicant proposes to lease to "Dollar General," a national discount retailer that has about eleven other locations in the State of Vermont.

4. Dollar General appears to be premised upon the surge of "dollar stores" throughout the United States, although a new visitor to a Dollar General store may be surprised to learn that many, perhaps most, of the items for sale in a Dollar General store are priced at more than one dollar.[3] Dollar General's stated company slogan is "today's general stores." Evidence presented at trial did not include any presentation that the general public shares this self-assessment.

5. Most, perhaps all, Dollar General stores are identified by their large signs containing a neon-yellow background and large black lettering. These signs appear out of place in most Vermont settings, including some commercial areas. The specific characteristics of the area surrounding the project site and similarities with the project and its signs are discussed in more detail below.

6. Applicant detailed the siting and landscaping for this proposed project in its permit application (Exhibit E) and project plans (Exhibits J1 through J12, containing twelve plan sheets). The project as proposed includes a new building, 76 feet wide by 140 feet deep, paved parking areas for 42 vehicles to the front (western) and northern sides of the building, a graveled area reserved for overflow parking that can accommodate 12 additional vehicles, landscaping, and on-site wastewater and stormwater treatment systems. See Exhibit J3, which is labeled sheet SP1.

---

[3] Applicant readily discloses in its application materials that Dollar General does not limit its goods to those costing a dollar or less. See Exhibit E at 3.

2

7.      Applicant describes the proposed project in its application as "retail dry goods shopping center; Phase I 10,640 sq ft bldg. w/ parking."  Exhibit E at 2.

8.      The project plans also show a shaded area labeled "Future Building Phase II," but no specifics were provided for this building or its future use.  Exhibit J3.  We therefore only analyze the component of Applicant's future plans for which it provided detail: the single building proposed to become a Dollar General store.[4]

9.      Dollar General initially provided plans for a building to be constructed that replicated one of its "prototype" designs, a copy of which was presented as Exhibit K.  This prototype design calls for exterior walls of concrete blocks and masonry bricks and appears to be a generic design of a flat-roofed, box-shaped retail store.

10.     Applicant presented a revised building design to the Court.  Several of the building design revisions now proposed by Applicant incorporate changes that the Town of Ferrisburgh Zoning Board of Adjustment ("the ZBA") required in its February 9, 2011 conditional use approval of Applicant's project.  A copy of the ZBA approval, with 17 conditions, was admitted as Exhibit F; the approval conditions are listed on pages 6–7.

11.     Applicant's revised plans for the proposed building are depicted on Exhibits L through L6.  Some of the more notable revisions to Dollar General's prototype design include:

   a.  Pitched roof with standing seam metal roofing;
   b.  Two large windows on the front (western) wall;
   c.  Faux barn door on the second floor of the front (western) façade;
   d.  Two barn-type cupolas on the roof; and
   e.  Faux windows on the northern and southern sides of the building.

12.     The roof ridge line runs parallel to Monkton Road and perpendicular to Route 7.  Thus the front (western) face of the building appears as a two-story barn structure.  This appearance is enhanced by the faux barn door on what appears to be the second floor of the building.  However, all retail space will be at ground level within the building.

13.     The exterior of the building will no longer use exposed concrete block on the front or side façades.  The front walls will have a lower wall of masonry brick, below the windows.  The remaining portions of the walls will be of metal siding that will have vertical features common to recently-constructed commercial barns.  The exterior walls depicted in Exhibits L through L6

---

[4] The narrative that accompanies the application speaks of "a small retail shopping plaza . . . [with] up to 3 new retail stores in this location."  Exhibit E at 3.  No details of this three store shopping plaza were revealed in Applicant's trial presentation.  We therefore limit our analysis to the single Dollar General store.

show tan and other earth-toned colored siding. This siding will also be replicated on the side walls of the cupolas.

14. Applicant represented that the proposed store will open no earlier than 8:00 AM and close no later than 9:00 PM each day.

15. Applicant's principal representative present at the trial, Joseph Handy (one of five brothers and sisters who formed Group Five Investments, LLC), advised that the LLC members incorporated these design revisions to the proposed building so that it would look similar to other commercial barn structures in the area. The proposed building is similar in appearance to commercial barn structures on nearby properties, including the Merkowski barn and the facilities at Dakin Farms, Denecker Chevrolet, and the new Dock Doctor's warehouse facility proposed between the project site and the Town village center.

16. Exterior lighting will illuminate the areas outside the building and parking areas, as depicted in Exhibit J5. The proposed lighting will provide sufficient illumination for the safe operation of the proposed Dollar General store during the evening hours, but no light will be shed off of the project site and onto abutting properties or streets. Id. Lighting will be of a down-cast, shielded lighting type, so that the glare of the light source will not be readily visible from off site.

17. Appellants' expert, Ms. Vissering, suggested that the new building's visual impact could be softened if Applicant switched the building entrance to the rear of the building, located the parking behind the building, and moved the building closer to the front of the lot, near Route 7. Ms. Vissering's analysis was not convincing and was outweighed by Mr. Handy's responses to her suggestions.

18. In particular, Mr. Handy provided convincing testimony that the change of parking location and building orientation could confuse customers and the general public, while providing little further aesthetic advantage to the design of the building. In fact, a reorientation that caused the rear of the building to face the adjoining state highway and with little visibility of the front aesthetic features of the building could cause the building to be less consistent with the nearby commercial buildings and uses.

19. Mr. Handy's testimony was made even more credible by his experience in operating nineteen convenience store facilities throughout northern Vermont. He could not recall a retail operation where all parking and the entrance to the store building was in the rear of the

4

building, farthest away from the adjoining highway.  Mr. Handy also discussed safety issues for customers and staff parking in the rear of a retail building during evening hours.  Mr. Handy credibly recalled occasions when his existing businesses have suffered break-ins, including one series of thefts that occurred when the thieves cut a hole in the rear exterior wall to enter a store and steal goods.  He expressed concern that locating the entranceway and windows of a retail building in the rear of the building may encourage break-ins.

20.     Access to the proposed project will be on the northern side of the lot, via a curb cut on Monkton Road.  See Exhibit J3 (Site Plan).  This access point will provide clear sight distances in either direction along Monkton Road, including to the signalized intersection with Route 7 to the west.  Applicant's proposed access curb cut has been approved by the Town Highway Department; the Department official determined that the proposed curb cut "meets all the safety criteria per Town of Ferrisburgh highway specifications."  Exhibit G.

21.     Appellants' expert, Mr. Oman, expressed concern about what he characterized as reduced sight distances to the west, towards Route 7, but the Court found his concerns unwarranted.  There is a clear line of sight through the Route 7 intersection, and vehicles will often be required to reduce speed or stop at the intersection, which has signalized traffic lights.

22.     Predicting what traffic a project of this scope might generate is made somewhat difficult by the project's small scale in relation to projects for which traffic impacts are often calculated.  Nonetheless, Applicant commissioned a traffic impact analysis for the proposed project.  Applicant's engineer, Mr. Matosky, prepared the analysis and summarized his findings and conclusions in a report admitted as Exhibit O.

23.     Mr. Matosky credibly testified about the project's traffic impact.  He provided an overview of the existing traffic on area highways and specific estimates on the traffic that the project will generate during the peak hours of traffic for area highways and what further intersection delays and queue lengths the project may cause, if any.  Id. at 3–4.  The project will not be open during the full morning peak hour of traffic for area highways; it will be open during the peak afternoon hour for area highway traffic (3:45 PM to 4:45 PM), as calculated by the Vermont Agency of Transportation ("VTrans").  At that afternoon peak hour, Mr. Matosky credibly estimated that the proposed project will generate 47 one-way vehicle trips.[5]  Id. at 3.

---

[5] Mr. Matosky calculated the vehicle trips that this project would generate by reference to the estimated trips generated by a retail store of this size, as reported by the Institute of Transportation Engineers in its Trip Generation manual, 8th Ed., Land Use 814 (Specialty Retail Center).  See Exhibit O at 3.  His estimates

24. The traffic that the proposed project generates will increase the number of vehicles that turn onto and off of Monkton Road from Route 7, since the project access will be off of Monkton Road. However, the project will not generate so much traffic as to significantly change the delays, queue lengths, and level of service for all turning directions of the Route 7/Monkton Road intersection. See Exhibit O at 4.

25. Applicant proposes to complete significant landscaping and plantings on the project site that will provide screening of the building, parking areas, and vehicles parked in those areas. See Exhibit J6 (Landscaping Plan). Multiple trees will be planted to the north of the building and parking areas. Id. In front of the building, facing Route 7, Applicant proposes to install an earthen berm between the parking area and Route 7 and to install and maintain plantings on top of the berm. Id. The landscaping and plantings depicted on Exhibit J6 will help soften the size and aesthetic appearance of the building, parking, and visiting vehicles, particularly from neighboring properties and for those traveling on nearby town and state highways.

26. The project will receive potable water from a municipal supply system.

27. The project will not generate discernible noise. The noises discernible from the project site and surrounding properties will come from passing motorists along the adjoining town and state highways, including those entering the project site.

28. There will be an on-site wastewater treatment system serving the project. Applicant has received a state wastewater permit for that system, a condition of which is that Applicant and its successors and assigns must install and operate the system according to the approved plans. A copy of the wastewater permit, as amended for the project (Permit #WW-9-1559-1), was admitted as Exhibit Q.

29. There are three small wetlands on the property—all identified as Class III wetlands and therefore not afforded the protection of more significant wetlands (i.e., Class I and II wetlands). See Exhibits Z, BB. Nonetheless, no disturbances are now planned within these minor wetlands.

30. The proposed building and paved parking areas will cause a significant increase in the impervious surfaces on the property and therefore increase the risk of untreated stormwater running off of the site. However, Applicant has proposed an on-site stormwater treatment

did not consider that some of the vehicles using the proposed project will be those already passing by the project site. Thus, he characterized all traffic expected to stop at the project as "new" vehicle trips.

system that will actually reduce the rate at which stormwater flows off the site by as much as fifty percent, according to credible estimates presented by Applicant's engineer, Mr. Matosky. Based upon such estimates and Applicant's plans, the Vermont Agency of Natural Resources, Department of Environmental Conservation ("DEC") issued an Authorization to Discharge Pursuant to General Permit #3-9015 for the project as proposed. This DEC Authorization (Permit #6582-9015), a copy of which was admitted as Exhibit U, requires Applicant and its successors and assigns to construct and maintain the stormwater treatment system components as designed and approved, make semi-annual inspections of the treatment system, and report the results of such inspections to DEC. See Exhibit U at 2.

## II. Surrounding Neighborhood

31. The Highway Commercial Zoning District in which the project is located represents one of the most significantly developed commercial areas in the Town. This characterization is reinforced by the existing commercial development at and near the Route 7/Monkton Road intersection and the characterizations and aspirations expressed in the Town of Ferrisburgh Town Plan ("Town Plan"), which identifies the area encompassing the Route 7/Monkton Road intersection as one of the areas of planned high density development. See Exhibit I[6] at 64.

32. In particular, the lands in the three other quadrants of the Route 7/Monkton Road intersection all host extensive commercial development. Across Monkton Road from the project site, in the northeastern quadrant of the intersection, is the Denecker Chevrolet new and used automobile dealership and repair shop. Denecker Chevrolet has illuminated ground and wall signs.

33. A small town road runs behind Denecker Chevrolet in a northeasterly direction; it serves one single family home, occupied by Appellant Gary Lange and his family. Mr. Lange provided credible testimony about his children walking from their home to Monkton Road and through the Route 7/Monkton Road intersection to Vergennes High School, which is located off of Monkton Road, just beyond that intersection.

34. Across Route 7 from the project site, in the southwestern quadrant of the intersection, lies a large array of solar panels, aligned in twenty or more rows. The solar panel lot dips below the elevation of the adjacent highways, much like the project site, making the solar panel array somewhat screened from the view of passing motorists.

---

[6] A copy of the Town Plan was admitted at trial as Exhibit I.

35.     Further along Monkton Road, to the west of the Route 7 intersection, are several businesses and residences.  The first structure after the intersection is occupied by real estate offices.  After three or so residences is a large parcel of land that hosts Vergennes High School, parking lots, and athletic fields.  A small residential neighborhood lies to the north of Monkton Road, across from the entrance to Vergennes High School.  Continuing along Monkton Road, one passes a Vermont Army National Guard facility, the Vergennes Armory, and a Merchants Bank branch office building.

36.     The solar panels, high school, and other nearby structures are visible to Route 7 travelers, especially as northbound travelers descend from a higher elevation to the Route 7/Monkton Road intersection.

37.     Several large commercial/retail developments occupy the northwestern quadrant of the Route 7/Monkton Road intersection, including a large Shaw's Supermarket, a Kinney Drug store, and an Aubuchon Hardware store.  Each store is located in an independent building; these commercial facilities are not aligned in a suburban strip mall type of development but, with their somewhat independent parking areas, occupy a large swath of land.

38.     Each of these stores has its own wall and ground signs.  Most are internally lit; all are illuminated in some manner.  Many of these signs employ large block lettering and bright background colors.  The Aubuchon Hardware store has a large wall sign with bright, neon yellow background and black block letters.  That sign faces Route 7.

39.     Route 7 is a major north/south arterial highway on the western side of our State.  In the vicinity of the project, Route 7 has wide travel lanes in each direction and wide shoulders.  At the intersection with Monkton Road, Route 7 widens to allow multiple lanes in each direction for the safety of both pass-through traffic and those motorists wishing to turn at the intersection.

40.     Route 7 in the vicinity of the project experiences consistent use; VTrans estimates that on average 7,300 vehicles passed through the Route 7/Monkton intersection each day.

41.     The Route 7 intersection includes a three-light traffic signal to assist drivers wishing to turn or travel through the intersection.  No delineated crosswalks exist at this intersection. There are presently no sidewalks constructed on any portions of Route 7 or Monkton Road in the vicinity of the intersection.

8

**Conclusions of Law**

Appellants filed a timely appeal from the ZBA conditional use approval of Applicant's proposed project and, in so doing, preserved certain legal issues for our review in this de novo appeal. V.R.E.C.P. 5(f). By their Statement of Questions, Appellants focus our review of Applicant's project on three general questions. We address each of those Questions in turn.

### I. Performance Standards (Appellants' Question 1)

By their Question 1, Appellants challenge whether Applicant has satisfied "<u>all</u> of the Performance Standards in the Ferrisburgh zoning ordinance, including but not limited to noise and lighting." (Appellants' Statement of Questions, filed Apr. 6, 2011 (emphasis in original).) The Town of Ferrisburgh Zoning Bylaws ("Bylaws")[7] establish certain performance standards for the use or occupancy of any land or building in any zoning district. Bylaws Art. VIII. Article VIII explains that the purpose of these Performance Standards is to prohibit the creation of any "dangerous, injurious, noxious or otherwise objectionable conditions in such a manner or in such amount as to adversely affect the reasonable use of the surrounding area of adjoining properties." Id.

We review the specific provisions of Bylaws Article VIII with this purpose in mind. Bylaws § 8.1 prohibits the use of land that will cause the following:

> [N]oise which is excessive at the property line and represents a significant increase in noise levels in the vicinity of the development so as to be incompatible with the reasonable use of the surrounding area . . . . Specifically, the sound pressure level should not exceed seventy decibels at the property line at any time, except for agricultural uses.

Bylaws § 8.1.

Applicant's project appears to not create any excessive noise, at the property line or otherwise, especially when measured in relation to the noise levels in the vicinity of this development. The most significant noise generator in this area is not an individual development but rather the state highway traffic, much of which does not stop at area businesses and would likely pass by this development. Appellants offered no refutation of Applicant's assertion that the project will not create excessive noise, and we find no basis for so concluding. We therefore conclude that Applicant's proposed project conforms to Bylaws § 8.1.

---

[7] The Town submitted a certified copy of the version of the Bylaws applicable to this case, which had been last amended in 1991. All references to section numbers correspond to the applicable 1991 version, not the most recently amended version.

Bylaws § 8.2 prohibits glare, lights, or reflection that "are a nuisance to other property owners or tenants or which could impair the vision of a driver of any motor vehicle or which are detrimental to public health, safety[,] and welfare." We received no evidence that lighting at the proposed project will cause any such nuisance. All lighting fixtures shall be down-cast and shielded, such that passing motorists will not observe or be irritated by the glow of the project light sources. Applicant's expert credibly presented estimates indicating that no project lighting will spill onto adjoining properties. Appellants offered no refutation of this estimate. Our analysis here is short, because there is little in opposition to assess. Applicant's proposed project conforms to Bylaws § 8.2.

There is only one other specific Performance Standard in Article VIII, and Appellants offered no evidence to contradict Applicant's assertion that its project conforms to this last Standard. Pursuant to Bylaws § 8.3, any use of land or buildings cannot obtain a permit if it includes "a fire, explosive[,] or safety hazard . . . [that] significantly endangers other property owners or which results in a significantly increased burden on municipal facilities." Id. We received no evidence that the proposed project will cause a fire, explosive, or safety hazard. We therefore conclude that Applicant's proposed project conforms to Bylaws § 8.3.

In light of our positive findings here, we conclude that Applicant's proposed project conforms to all Performance Standards contained in the Bylaws.

## II.     Conditional Use Standards (Appellants' Questions 2 & 3)

Appellants' Question 2 asks whether Applicant has shown that its proposed project will conform to "all of the General and Specific Conditional Use standards in [Bylaws] Article IX." (Appellants' Statement of Questions, filed Apr. 6, 2011 (emphasis in original).) Appellants' Question 3 asks whether Applicant has shown that its proposed project will conform to all "requirement[s] of the Conditional Use enabling statute." Id.

The Vermont state legislature has authorized Vermont municipalities to condition the use and development of land upon general and specific standards, provided that the conditions they establish conform to the thresholds in the enabling legislation. Vermont's current statute enabling municipalities to include conditional use review in their bylaws is 24 V.S.A. § 4414(3). Bylaws § 9.4, the Town's conditional use provision in effect at the time Applicant filed its permit in this case, was adopted under the former 24 V.S.A. § 4407(2), which was repealed by the Permit Reform Act of 2004 and replaced with § 4414(3). See 2004 Vt. Acts and Resolves No. 115.

The repeal of § 4407 did not invalidate Bylaws § 9.4, however. See 24 V.S.A. § 4481. Under the "Savings Clause" contained in 24 V.S.A. § 4481, municipalities had until September 1, 2011 to amend ordinances, including those establishing conditional use review of permit applications, to conform to the new statutory provisions enacted through the Permit Reform Act. When Applicant submitted its permit application in September of 2010, see Exhibit E at 1, Ferrisburgh had not amended the conditional use provision of the Bylaws to include the term "undue adverse impact." See Bylaws § 9.4. Thus, we consider this case under the language in the Bylaws, which requires that conditional uses not "adversely affect" "[t]he character of the area affected."

The general standards in Bylaws § 9.4(A) recite the general standards formally required by 24 V.S.A. § 4407(2). Compare 24 V.S.A. §§ 4407(2) with Bylaws §§ 9.4(A)(2), (4). Bylaws § 9.4 also includes all specific standards that the enabling legislation requires. Compare 24 V.S.A. § 4407(2) with Bylaws §§ 9.4(B)(4) through (7). Since the conditional use provisions in the Bylaws satisfy and conform to the requirements of the enabling statute that was applicable to the Ferrisburgh Bylaw provision at the time the pending application was filed, we follow the Bylaws provisions in addressing the legal issues Appellants raise in their Questions 2 and 3.

Bylaws § 9.4 requires a determination "that the proposed use will not <u>adversely affect</u>" the enumerated general standards. Bylaws § 9.4(A) (emphasis added). This language mirrors verbiage contained in the former 24 V.S.A. § 4407, but it differs from that contained in the new enabling statute, 24 V.S.A. § 4414(3). Section 4414(3) states that a municipality's zoning regulations must "require that the proposed conditional use shall not result in <u>an undue adverse effect</u> on any of" the adopted general standards. <u>Id</u>. (emphasis added). Appellants in this case claim that the proscription against a use "adversely affect[ing]" the general standards is more restrictive than the "undue adverse effect" standard in § 4414(3) and that the Court must apply this more restrictive standard when considering the pending application. Based upon the case law that has defined these separate terms, however, we conclude that they are interchangeable in application.

The term "undue adverse effect" is applied in the context of reviewing an application for a state land use permit, particularly when considering a project's impacts upon "scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). The former Vermont Environmental Board originally concluded that the

11

term necessitated a two-step analysis, often referred to as "the Quechee test" because of the application that led to its adoption. See Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order (Vt. Envtl. Bd. Nov. 4, 1985). The former Board offered a common-sense definition of "undue adverse effect" by stating that:

> [t]he term "undue" generally means that which is more than necessary— exceeding what is appropriate or normal. The word "adverse" means unfavorable, opposed, hostile. "Scenic and natural beauty" pertain to the pleasing qualities that emanate from nature and the Vermont landscape. In short, through Criterion 8 the Legislature has directed that no project within our jurisdiction be approved if it has an unnecessary or inappropriate negative impact on the enjoyment of surrounding natural and scenic qualities.

Id. at 17 (quoting Re: Brattleboro Chalet Motor Lodge, Inc., No. 4C0581-EB, Findings of Fact, Conclusions of Law and Order, at 6 (Vt. Envtl. Bd. Oct. 17 1984).

Our Supreme Court has repeatedly announced its approval of a fact finder's use of the Quechee test in reviewing a project's impacts. See In re McShinsky, 153 Vt. 586, 591 (1990). Most recently, the Supreme Court articulated the analysis under the Quechee test in the following manner:

> The Board employs a two-pronged approach to determine if an application complies with Criterion 8. First, it determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue. An adverse impact is considered undue if any one of the three following questions is answered in the affirmative: (1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re: Appeal of Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8, 183 Vt. 336 (internal citations omitted). Since jurisdiction of appeals from state land use permit determinations was transferred from the former Environmental Board to this Court, we have applied the Quechee test whenever called upon to assess a proposed project's conformance to Act 250 criterion 8. See In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.), aff'd 2009 VT 98, 187 Vt. 208.[8] Given the common knowledge of how the Quechee test defined the term "undue adverse effect," we understand that in adopting that term in the rewrite of the conditional use enabling statute, 24 V.S.A. § 4414(3), our legislature intended analysis of

---

[8] Our merits decision in Eastview includes an historical summary of the Quechee test. Id. at 13–17.

applications for municipal conditional use approval to be guided by the two-pronged test employed in Quechee.

We do not see a conflict in employing the Quechee test to determine the proposed project's conformance with Bylaws § 9.4(A), even though that municipal provision speaks merely of adverse effects, rather than "undue" adverse effects, because our Supreme Court has held "that the adverse effect test [referenced in zoning municipal ordinances] must be applied reasonably to prohibit only substantial and material adverse effects." In re Miller, 170 Vt. 64, 69 (1999) (citing In re Walker, 156 Vt. 639, 639 (1991) (mem.)). In this case, we find no discernible difference between "substantial and material" and "undue." It appears that by adopting the new enabling statute (24 V.S.A. § 4414(3)), the Legislature did not so much effectuate a material change in the applicable law, but rather cause the statutory language to conform to the legal interpretation that the Supreme Court had developed. See State v. Messier, 2005 VT 98, ¶ 10, 178 Vt. 412 (quoting Thayer v. Herdt, 155 Vt. 448, 453 (1990)) (stating that in assessing the import of a statutory amendment, courts presume that the Legislature made changes in the law in light of relevant Supreme Court decisions). Seeing no substantive difference in the interpretations of the current Bylaw language and that employed in Act 250, we therefore employ the two-pronged approach of Quechee in our analysis of whether the proposed project conforms to Bylaws § 9.4.

**A. General Standards.**

1. *Capacity of existing or planned community facilities.*

Bylaws § 9.4(A)(1) requires that we determine whether the proposed project will have an undue adverse effect on the capacity of existing or planned community facilities. Applicant provided general testimony that the proposed project will have no effect upon such facilities, and Appellants offered no testimony to contradict Applicant's assertions. Normally, review under a criterion such as this includes a discussion of whether the proposed project will overload a community's schools, police or fire departments, or whether the traffic generated will cause unsafe conditions on the area town highways. There was no showing of such an impact here. We conclude that the proposed project conforms to Bylaws § 9.4(A)(1).

2. *Character of the area affected.*

Subsection (2) of Bylaws § 9.4(A) asks whether the proposed project will cause an undue adverse impact upon the character of the area. Appellants' expert, Ms. Vissering, provided a

thoughtful analysis of how a development's impact may reach beyond the adjacent areas. In relation to the project now before us, Ms. Vissering emphasized that the areas outside of this Highway/Commercial Zoning District are predominately residential and agricultural in character and could experience adverse effects due to the incremental impacts of commercial developments such as Applicant's proposed project. To emphasize this point, Appellants characterized the proposed project as a type of "strip mall" shopping center development.

Despite Ms. Vissering's arguments, we cannot agree with Appellants' assessment of adversity caused by this project. First, Appellants' characterization of Applicant's proposed project is mistaken; the project as proposed does not have the negative attributes associated with strip mall developments. The proposed project has been designed to host a single business, not a strip of multiple stores in a bland, flat-roofed structure. Second, we note that all the parcels of land adjacent to the project site have commercial developments, including large barn structures. Interestingly, if the existing commercial developments had detrimental impacts upon this area, we would have expected evidence of such impacts to be presented. Instead, Appellants presented no evidence to show that the existing commercial developments in the vicinity of this project site have had an unduly adverse impact upon the character of this area. Without such evidence, we are hard pressed to conclude that the addition of Applicant's proposed project will have an incremental adverse impact.

We do not dispute that residences occupy the areas outside of the Route 7/Monkton Road intersection. But that intersection and the commercial developments that surround it establish the character of this area. The proposed project fits the character of this area, and we find no credible evidence to support Appellants' expressed concerns that the proposed project will have an adverse impact that extends outside of its immediate area, incremental or otherwise. We therefore conclude that the proposed project conforms to Bylaws § 9.4(A)(2).

### 3. *Traffic on the roads and highways in the vicinity.*

Under Bylaws § 9.4(A)(3), a proposed project may not adversely affect "[t]raffic on the roads and highways in the vicinity" of the project. Applicant's evidence convinced the Court that the proposed project will cause only a small increase in the traffic on adjoining roads. The actual number of estimated vehicle trips (47 new one-way vehicle trips during the afternoon peak traffic hour) is minor, and the level of service at the Route 7/Monkton Road intersection will not be adversely impacted. We conclude that the project as proposed will not cause an

adverse impact to the roads and highways in the vicinity and therefore conforms to Bylaws § 9.4(A)(3).

### 4. *The Town Plan and Bylaws in effect.*

Bylaws § 9.4(A)(4) requires that we consider whether the proposed project has an undue adverse impact upon the Bylaws and applicable provisions of the Town Plan. The Town Plan specifically identifies the area of the proposed project as having a high concentration of commercial development. Exhibit I at 68. The actual development surrounding the Route 7/Monkton Road intersection confirms the Town Plan's characterization.

Appellants would have us read more into the Bylaws' purposes provision and the applicable provisions of the Town Plan than appears in these municipal documents. The Town Plan and Bylaws classifications for this area encourage commercial development such as the project Applicant proposes. In fact, the Town Plan encourages commercial development in the Highway/Commercial Zoning Districts so that there will be less development pressure in "low-density residential or open space/agricultural land." Exhibit I at 68.

While the traditional design for Dollar General stores does not present itself as the most aesthetically pleasing commercial development, in this Court's estimate, the proposed project—particularly with the aesthetic improvements in Applicant's revised site plan—is aligned with the existing developments on adjoining lands. No party to these proceedings asserted that those existing developments have caused an adverse impact upon the Bylaws or the Town Plan. Without a credible factual foundation, we cannot make the legal determination that the proposed project will be adverse to provisions of the Bylaws or Town Plan. We therefore conclude that the project as proposed conforms to Bylaws § 9.4(A)(4).

### 5. *Utilization of renewable energy resources.*

No party to this appeal claims that the proposed project will have an adverse impact upon the utilization of renewable energy resources. Interestingly, the project is sited across Route 7 from a large array of solar panels; it will have no impact upon this or any other installation. The project conforms to Bylaws § 9.4(A)(5).

### 6. *Appropriate use or development of adjacent properties.*

There was no evidence presented that the proposed project will interfere with the continued use of adjacent properties. The view of the Project will be screened by Applicant's plantings and landscaping, although there will be clear views of the Dollar General building

15

and parking lot from some adjacent lots and highways. However, given the existing uses of adjoining properties, the development of this property will complement, not contradict or conflict with, the existing area uses. The project conforms to Bylaws § 9.4(A)(6).

**B. Specific Standards.**

Subsection (B) of the conditional use provisions of the Bylaws authorizes the ZBA, and this Court on appeal, to "impose . . . other conditions found necessary to protect the best interests of the surrounding property, the neighborhood[,] or the town as a whole." Bylaws § 9.4(B). The to-be-imposed conditions may refer to (1) minimum lot size; (2) distance from adjacent or nearby uses and height or lot coverage that may obstruct natural, historic, or agricultural lands; (3) environmental impacts detectable at the development's boundaries that are obnoxious or excessive; (4) minimum off-street parking and loading facilities; (5) landscaping and fencing; (6) design and location of structures and service areas; and (7) size, location, and design of signs. Id. We address these Specific Standards in turn.

We first note that Applicant chose not to appeal any of the seventeen conditions the ZBA imposed when it granted conditional use approval for this project. By not appealing, Applicant conceded to these conditions and cannot contest them in any later proceeding. 24 V.S.A. § 4472(d). Thus, the only legal analysis required is whether, if we conclude that Applicant's project is entitled to conditional use approval, the facts warrant additional conditions being imposed pursuant to Bylaws § 9.4(B).

Our prior analysis already includes many of the legal issues raised in the Specific Standards contained in Bylaws § 9.4(B). We therefore offer the following summary, relying upon our prior analysis.

The project site exceeds the minimum lot size required for its host zoning district (2 acre minimum). Bylaws § 4.4(C). We therefore conclude that the Project conforms to Bylaws § 9.4(B)(1).

The project conforms to the applicable restrictions on lot coverage and building height. While there was testimony concerning the views of scenic areas from adjacent lands and highways, there was no suggestion that the proposed project would obstruct or interfere with the views of these scenic areas. The project conforms to Bylaws § 9.4(B)(2).

We have already considered whether the project conforms to the Performance Standards established in Bylaws Article VIII and concluded that it does. We received no other credible

16

evidence that the proposed project will cause the "obnoxious or excessive" impacts itemized in Bylaws § 9.4(B)(3). In addition, the wastewater and stormwater permits issued by DEC provide a credible, uncontradicted showing that the project as proposed will treat all "liquid or solid refuse or waste" on the project site. Id. We therefore conclude that the Project conforms to Bylaws § 9.4(B)(3).

The Project as proposed provides more parking spaces than the minimum required by the Bylaws. See Bylaws § 6.2(F) (requiring "one parking space for every motor vehicle used in [the] business, plus [one more space for] every two hundred square feet of floor area"). The parking as proposed will mostly be in the front of the building. While Appellants would prefer that the parking and entrance be relocated behind the building, we believe that this redesign of the project will offer little to no aesthetic advantages and will present several disadvantages, especially from a safety perspective. Under the current site plan, there will be sufficient areas to the rear and sides of the building for Dollar General and its suppliers to offload their goods. We therefore conclude that the project conforms to Bylaws § 9.4(B)(4).

Applicant has proposed extensive landscaping and plantings for the project site. Applicant's proposed landscaping and screening will only offer minimal screening for the proposed Dollar General store and parking areas, but the view of this development will not be significantly more dramatic than that of the adjoining commercial developments, including Denecker Chevrolet, Kinney Drugs, Aubuchon Hardware, and Shaw's Supermarket. Passing motorists will even have clear views of the partially screened solar panel array and the Vergennes High School and athletic facilities. We see no increased benefit to a condition requiring Applicant to conduct additional landscaping and plantings. We therefore conclude that the project conforms to Bylaws § 9.4(B)(5) without further conditions.

As noted above, we decline to adopt the building and parking reconfigurations Appellants proposed, since we disagree that their redesign suggestions, or any others, will materially benefit the surrounding area and land uses. We see no need to include conditions that would alter Applicant's building and service area plans.

There was much discussion at trial, however, about the sidewalk that the ZBA required Applicant to install along the southerly boundary of Monkton Road, leading from its intersection with Route 7 and up to the project's access drive. Applicant's plans now show this

graveled walkway; while Applicant appears to have begrudgingly agreed to install this sidewalk, Applicant concedes that it cannot contest the sidewalk condition in this appeal.

Mr. Lange credibly testified that his children and others walk through the Route 7/Monkton Road intersection to reach the Vergennes High School. There is a sidewalk that leads to the High School from that intersection, but no other sidewalks presently exist on the other sides of Monkton Road or on Route 7. There also are no crosswalks through the highway intersection, which is concerning in light of the frequency with which children walk through the intersection, according to Mr. Lange's testimony. But there was no credible testimony that the proposed project will materially increase the pedestrian traffic through this intersection, so we decline to condition our approval of Applicant's project upon an installation of additional sidewalks or highway crosswalks.

On the other hand, Appellants note that the sidewalk Applicant is required to install could encourage pedestrians to walk on that side of Monkton Road, including those pedestrians who may wish to enter the project site, and that there is no crosswalk directing pedestrians safely through the project parking lot to enter the Dollar General store. We therefore conclude that Applicant should be required to install and maintain a painted crosswalk from the paved area near where its sidewalk will end and across its parking lot, so as to provide a safe walkway for visitors and to remind motorists to watch out for these pedestrians. With this added condition, we conclude that the Project will conform to Bylaws § 9.4(B)(6).

No party contested the ZBA's conditional approval of and limitation on the proposed Dollar General signs. We therefore see no need to supplement the ZBA's sign approvals and limitations. The proposed project otherwise conforms to Bylaws § 9.4(B)(7).

For all these reasons, we conclude that the project as proposed conforms to all of the General and Specific Standards of Bylaws § 9.4 and is therefore entitled to conditional use approval. This concludes our analysis of the legal issues raised in Appellants' Statement of Questions.

#### Conclusion

For all the reasons more fully discussed above, we **GRANT** Applicant conditional use approval for its proposed project, which consists of a single retail building located on a 9.9± acre parcel in the southeastern quadrant of the intersection of Vermont Route 7 and Monkton Road in the Town of Ferrisburgh, all in accordance with the project plans admitted at trial (Exhibits J1

18

through J12), subject to the seventeen conditions contained in the Town of Ferrisburgh Zoning Board of Adjustment approval, dated February 9, 2011, and with the added condition that Applicant install and maintain a painted crosswalk across its parking lot for pedestrians using the to-be-installed sidewalk on Monkton Road.

These proceedings are remanded to the Town of Ferrisburgh Zoning Administrator, solely to complete the ministerial act of issuing a zoning permit in conformance with this Merits Decision and the unappealed conditions imposed by the ZBA.

A Judgment Order accompanies this Decision. This completes the current proceedings before this Court concerning this appeal.

Done at Berlin, Vermont, this 4th day of December 2012.

_____
Thomas S. Durkin, Environmental Judge