**Opinion issued February 9, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00508-CV

———————————

**FRANCISCO CHAMUL, Appellant**

**V.**

**AMERISURE MUTUAL INS. CO., Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-14219**

---

## O P I N I O N

Francisco Chamul suffered a serious work-related injury and filed a worker's compensation claim seeking lifetime-income benefits. His application was denied. After completing the administrative review process, the trial court granted summary judgment against him.

In two issues, he contends that the trial court erred by (1) applying an overly restrictive definition to an undefined statutory term—imbecility—in support of summary judgment for the insurer and (2) finding that his treating physician's affidavit qualifies as a sham affidavit and therefore is incompetent summary judgment evidence.

We reverse and remand.

## Background

### A. Legal background concerning "imbecility" as statutory standard for benefits

The Labor Code provides for lifetime-income benefits for employees who suffer certain devastating injuries. TEX. LAB. CODE ANN. § 408.161(a)–(b) (West 2015). Among the list of qualifying injuries is "a physically traumatic injury to the brain resulting in incurable insanity or imbecility." *Id.* § 408.161(a)(6). This basis for lifetime-income benefits dates back to 1917. *See* Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 1, Part I, sec. 11a, 1917 Tex. Gen. Laws 269, 275; *see also Lumbermen's Reciprocal Ass'n v. Gilmore*, 258 S.W. 268, 269 (Tex. Civ. App.—Texarkana 1924) (quoting imbecility provision from workers' compensation statute of 1917), *aff'd*, 292 S.W. 204 (Tex. 1927). Despite the long-standing use of "imbecility" as a standard, the Labor Code does not define the term, and its meaning has proven to be anything but clear.

Further complicating the matter is that the terminology used to address and differentiate between various levels of intellectual deficits is constantly evolving. *See* Caroline Everington, *Challenges to Conveying Intellectual Disabilities to Judge and Jury,* 23 WM. & MARY BILL RTS. J. 467, 484–85 (2014). Terms are coined and then fall in disfavor. "Feeble-minded" and "imbecile" were used in the early twentieth century. *See Buck v. Bell*, 274 U.S. 200, 47 S. Ct. 584 (1927) (using both terms interchangeably in much-criticized opinion while discussing woman subject to involuntary sterilization); Tomoe Kanaya et al., *The Flynn Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society Via Mental Retardation Diagnosis*, 58 AM. PSYCHOLOGIST 778, 788 (2003) (noting that intellectual-capacity labels are "continually supplanted by newer ones over time. For example, terms such as imbecile and feeble-minded were considered scientific and acceptable in the first quarter of the 20th century but were replaced after time with successive euphemisms." (emphasis omitted)). A more recent example of changing terminology is the shift from using the term "mentally retarded" to "intellectually disabled." *See Ex parte Cathey*, 451 S.W.3d 1, 5 (Tex. Crim. App. 2014).

Whatever meaning the Legislature attached to the term "imbecility" when it included the standard in the lifetime-income-benefits provision in 1917, it is clear that the term has little medical significance today. The medical experts in this case

agree that the term "imbecility" is no longer part of the language of medicine for diagnosing patients or developing treatment plans to address their afflictions. Chamul's treating physician stated that the term "imbecility" is "offensive" and not used by members of the medical profession to her knowledge. Amerisure's selected neuropsychiatric expert included in his report the following statement: "Please note that use of imbecility or incurable insanity is pejorative. I only use it because it is administratively/statutorily required and does not reflect my personal or professional language use."

The Legislature updates statutes to remove "demeaning" terms and phrases and replace them with more acceptable terms, but it has not yet chosen to retire "imbecility" as a standard for benefits. *Cf.* TEX. GOV'T CODE ANN. § 392.001 (West 2013) (stating that demeaning terms create invisible barriers to inclusion of individuals with disabilities); TEX. GOV'T CODE ANN. § 325.0123 (West 2013) (discussing statutory revisions to use phrase "intellectual disability" instead of "mental retardation"). We can infer nothing from this inaction because a "legislature legislates by legislating, not by doing nothing, not by keeping silent." *Sanchez v. Schindler*, 651 S.W.2d 249, 252 (Tex. 1983) (quoting *Wycko v. Gnodtke*, 105 N.W.2d 118, 121–22 (Mich. 1960)). "[L]egislative silence . . . may reflect many things, including implied delegation to the courts or administrative agencies, lack of consensus, oversight, or mistake." *Brown v. De La Cruz*, 156

4

S.W.3d 560, 566 (Tex. 2004). Here, we know only that the terminology has remained unchanged.

Charging the hearing officers and the courts with construing a statutorily undefined term that is now outdated and considered offensive presents challenges. Adding to the challenge is the dearth of case law attempting to define the term. Before turning to that body of law, we consider the evidence of Chamul's neurocognitive injury.

## B.    Factual background concerning Chamul's injury and his diagnoses

While working as a brick mason for Camarat Masonry, Francisco Chamul fell from a scaffold onto a concrete slab more than 10 feet below. He suffered a serious head injury. Specifically, he had multiple fractures of his skull, a left subdural hematoma with diffuse cerebral edema, and intercranial pressure that required bilateral decompression craniectomies. He also suffered spinal cord injuries, fractured ribs, and more. He was transported to Ben Taub Medical Center where he remained in a coma for 36 days.

Chamul was transferred to the Mentis Neuro-Rehabilitation Facility for rehabilitation. Approximately six months later, he underwent his first extensive neuropsychological evaluation performed by Dr. Francisco Perez. Dr. Perez diagnosed Chamul with neurocognitive problems, including significant memory

deficiencies that negatively impacted his visual memory, ability to learn, and ability to retain new verbal information.

Chamul's next evaluation was by Dr. Cindy B. Ivanhoe at The Institute for Rehabilitation and Research in Houston. Dr. Ivanhoe testified that Chamul suffers from seizures and cognitive problems that affect his memory, thought organization, and understanding interpersonal dynamics. Chamul is not capable of living independently, needs to be supervised, is unable to operate a motor vehicle, and is permanently unable to return to competitive employment as a result of his brain injury. She further stated: "It is my opinion that Francisco Chamul is permanently mentally incapacitated because of his work related injuries."

Approximately two years after beginning treatment with Dr. Ivanhoe, Chamul was examined by Dr. Stanley Hite, a doctor appointed by the Division of Workers' Compensation. According to Dr. Hite, Chamul functions at the level of an 11 or 12 year-old, is unable to care for himself, and will need a caretaker for the rest of his life. Dr. Hite opined that Chamul's condition will not improve.

Chamul was also examined by Wallace Stanfill, a certified rehabilitation counselor. After assessing Chamul, Stanfill concluded that he 'has experienced a total and permanent loss of the functioning of his brain from a vocational standpoint." While agreeing that Chamul "is marginally functional in many basic areas," Stanfill opined that he "is not considered to be cognitively able to engage in

any degree of competitive work, even unskilled employment." Instead, "[h]is current level of functioning would [be] at best more in keeping with sheltered employment," which is consistent with Dr. Ivanhoe's assessment.

Felix Chamul is Chamul's father and primary caregiver. He stated in his affidavit that his son is unable to manage his medical and financial affairs and needs assistance with dressing and grooming. He believes that Chamul is unemployable.

Amerisure retained neuropsychiatrist Dr. Andrew Brylowski to examine Chamul. Dr. Brylowski concluded that, although Chamul had a significant, traumatic brain injury with diffuse brain swelling, he "did not sustain any type of irreversible brain injury which would rise to the level of rendering him permanently unemployable because of eliminating his ability to engage in a range of usual cognitive processes." Dr. Brylowski diagnosed Chamul with "malingering," concluding that he inaccurately reported information during the examination. Dr. Brylowski opined that "any cognitive, conative, neuroendocrine, sensory and motor function, or brainstem/cranial nerve function can be treated and managed to help [Chamul] reintegrate into the workforce."

## C. The definition of "imbecility" used in Chamul's administrative and judicial proceedings thus far

At the contested-hearing level, the hearing officer noted that the Labor Code does not define "imbecility" and concluded that past administrative appeals panels

7

and courts have adopted a definition of "imbecility" from a dictionary published in 1991; this definition "contemplates that the affected individual will not only require supervision in the performance of routine tasks, but will have a mental age[1] of three to seven years." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991) In support of that statement, the hearing officer cited two sources: *Liberty Mutual Insurance Co. v. Camacho*, 228 S.W.3d 453 (Tex. App.—Beaumont 2007, pet. denied) and Appeals Panel Decision No. 961340, 1996 WL 487735 (Aug. 21, 1996).

---

[1]     The Supreme Court discussed the concept of "mental age" in *Penry v. Lynaugh*, 492 U.S. 302, 339–40, 109 S. Ct. 2934, 2958 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002):

> Mental age is "calculated as the chronological age of nonretarded children whose average IQ test performance is equivalent to that of the individual with mental retardation." Such a rule should not be adopted today. . . . [T]he "mental age" concept, irrespective of its intuitive appeal, is problematic in several respects. As the AAMR [American Association for Mental Retardation—now American Association on Intellectual Developmental Disabilities] acknowledges, "[t]he equivalence between nonretarded children and retarded adults is, of course, imprecise." The "mental age" concept may underestimate the life experiences of retarded adults, while it may overestimate the ability of retarded adults to use logic and foresight to solve problems. The mental age concept has other limitations as well. Beyond the chronological age of 15 or 16, the mean scores on most intelligence tests cease to increase significantly with age. As a result, "[t]he average mental age of the average 20 year old is not 20 but 15 years."
>
> Not surprisingly, courts have long been reluctant to rely on the concept of mental age as a basis for exculpating a defendant from criminal responsibility.

(Internal citations and parentheticals omitted.)

The hearing officer considered the evidence—which included Dr. Hite's opinion that, while Chamul is unable to care for himself, he functions at the level of an 11 or 12 year-old—and stated his determination as follows:

> The evidence presented at the Contested Case Hearing reveals that although Claimant likely meets the initial portion of the definition [that "the affected individual will . . . require supervision in the performance of routine tasks"], Claimant has not been shown to exhibit the mental age range in question ["a mental age of three to seven years"].

Thus, the decision of the hearing officer was that Chamul was not entitled to lifetime-income benefits for his work-related injury. Chamul was informed that the Appeals Panel was allowing the hearing officer's decision to become final. Chamul sought judicial review of the decision.

Both Chamul and the insurer, Amerisure Mutual Insurance Company, filed summary-judgment motions with the trial court. Amerisure highlighted the issue presented in the competing motions: "The crux of the cross motions for summary judgment in this case turn on the definition of 'imbecility.'" Amerisure argued that "imbecility" should be interpreted to mean a "feebleminded person having a mental age of three to seven years . . . ." Chamul, on the other hand, argued for a more general definition: "an irreversible brain injury, which renders the employee permanently unemployable and so affects the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes."

9

Amerisure also argued that the affidavit of Chamul's treating physician, Dr. Ivanhoe, should be disregarded as incompetent summary-judgment evidence because it is a sham affidavit.

The trial court applied Amerisure's "imbecility" definition. The court also found that Dr. Ivanhoe's affidavit is a sham affidavit and, as a result, disregarded it. Based on the remaining evidence, including various physicians' statements that Chamul had not been reduced to a mental age of three to seven years, but, instead, closer to a mental age of 11 years, the trial court granted Amerisure's summary-judgment motion and denied Chamul's. Thus, Chamul remained without lifetime-income benefits.

Chamul timely appealed.

## Summary Judgment

Both parties moved for summary judgment on the issue whether Chamul's traumatic brain injury resulted in "imbecility" to meet the requirement for lifetime-income benefits.

### A. Standards of review

A party moving for Rule 166a(c) summary judgment must conclusively prove all of the elements of its cause of action as a matter of law. TEX. R. CIV. P. 166a(c); *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001); *Rhone Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999). A

defendant moving for summary judgment on a cause of action asserted against it must negate as a matter of law at least one element of the plaintiff's theory of recovery or plead and prove each element of an affirmative defense. *Nelson v. Chaney*, 193 S.W.3d 161, 165 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

"When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *accord Gillebaard v. Bayview Acres Ass'n*, 263 S.W.3d 342, 348 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The reviewing court should render the judgment that the trial court should have rendered. *See Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004); *Comm'rs Court of Titus Cty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *Gillebaard*, 263 S.W.3d at 347–48. The propriety of summary judgment is a question of law. We, therefore, review the trial court's grant of one party's motion and denial of the other's using the de novo standard. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

We review issues of statutory construction de novo as well. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). We rely on the plain meaning of the text chosen by the Legislature. *Id.* "We use

definitions prescribed by the Legislature and any technical or particular meaning the words have acquired." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). Otherwise, we construe the statute's words according to their plain and common meaning unless a contrary intention is apparent from the context or such a construction leads to absurd results. *Id.* at 625–26; *Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 901 (Tex. 2010) ("Presuming that lawmakers intended what they enacted, we begin with the statute's text, relying whenever possible on the plain meaning of the words chosen."); *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999) (explaining that "it is a fair assumption that the Legislature tries to say what it means . . . ."). The Texas Supreme Court has held that the Texas Workers' Compensation Act should be liberally construed to confer benefits upon injured workers. *Lujan v. Houston Gen. Ins. Co.*, 756 S.W.2d 295, 297 (Tex. 1988).

## B.     The source of the mental-age based definition of "imbecility" that was applied to Chamul's claim

The mental-age based definition of imbecility that was found in the 1991 dictionary entry and later adopted by Chamul's hearing officer and relied on by the trial court to deny his claim appears to slice out an age range (i.e., three to seven years), thereby indicating that higher and lower age ranges exist. There is a historical context to this stratification. *See* Michael Clemente, Note, *A Reassessment of Common Law Protections for "Idiots*," 124 YALE L.J. 2746,

12

2756–58, 2763–68 (2015). It can be traced to the now-repudiated eugenics movement of the late-nineteenth to mid-twentieth century. *Id.* at 2763–64; *see* Sarah Fender, BIOETHICS IN HISTORICAL PERSPECTIVE 11 (Palgrave MacMillan 2013).

Eugenics was a social movement that sought to control human heredity. *See* BIOETHICS IN HISTORICAL PERSPECTIVE at 11. Its adherents emphasized the genetic source of traits and believed that good traits could be accentuated in a population by good breeding and bad traits could be minimized by selective sterilization. Jennifer S. Geetter, *Coding for Change: The Power of the Human Genome to Transform the American Health Insurance System*, 28 AM. J. L. & MED. 1, 1–19 (2002) (discussing eugenics movement as precursor to scientific study of genetics). These ideas were eventually repudiated, but, before that would occur, many social and governmental programs were enacted based on these beliefs. *See id.* One was the government-mandated involuntary sterilization program that led to the infamous 1927 case of *Buck v. Bell*, 274 U.S. 200, 47 S. Ct. 584 (1927).[2] There, the United States Supreme Court held that a "feeble-minded" woman, who was said to have been born to a "feeble-minded" mother and to have had a "feeble-minded"

---

[2] *See Fieger v. Thomas*, 74 F.3d 740, 750 (6th Cir. 1996) (noting that *Buck* has been repudiated except for its discussion of selective enforcement).

child out-of-wedlock,[3] did not have constitutional protection against involuntary sterilization. 274 U.S. at 205–07, 47 S. Ct. at 584–85. In a harshly worded opinion, Justice Holmes wrote that "[t]hree generations of imbeciles is enough." 274 U.S. at 207, 47 S. Ct. at 585.

While Justice Holmes and some others in that era used the terms "feeble-minded" and "imbecile" interchangeably,[4] a prominent eugenicist, Henry Herbert Goddard, sought to differentiate between levels of deficits. He created a three-tier system for classifying "feeble-minded" individuals' cognitive abilities. *See A Reassessment of Common Law Protections for "Idiots,"* 124 YALE L.J. at 2763 (citing Henry Herbert Goddard's *Report on Committee on Classification of Feeble-Minded*, 15 J. PSYCHO-ASTHENICS 61–67 (1910)). Under Goddard's system, "idiots" had an IQ of 25 or below with a calibrated mental age of up to two years; "imbeciles" had an IQ between 25 and 50 with a calibrated mental age of three to

---

[3] Scholarly research later revealed that neither the plaintiff nor her daughter had low IQ. Instead, the plaintiff's foster parents were intent to institutionalize her after their nephew raped her, which led to the birth of a daughter, who actually excelled in school until her young death. *See* Paul A. Lombardo, *Three Generations, No Imbeciles: New Light on* Buck v. Bell, 60 N.Y.U. L. REV. 30, 53–54, 61 (1985).

[4] *See* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L. REV. 414, 421 n.38 (1985) (stating that terms "'idiots,' 'imbeciles,' 'morons,' and 'feebleminded,' [were] all used to describe different degrees of mental retardation. The terminology was used without precise uniformity . . . . On occasion each term has been used as an umbrella term to include all levels of disability."); *see also* A DICTIONARY OF MEDICAL SCIENCE 428 (Lea Brothers & Co., 23d ed. 1903) (defining "feeblemindedness" as "[w]eak mental condition[] in which are included dementia, idiocy, and imbecility.").

seven years; and "morons" had an IQ between 50 and 75 with a calibrated mental age of eight to 12 years of age. *Id.* at 2763 (again citing Journal of Psycho-Asthenics 1910 Report).

Some dictionaries published after this eugenics era incorporated the tier system into their definitions of these words. *See, e.g.*, MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1052 (6th ed., 2003) (defining "imbecile" as "person of middle-grade mental deficiency; the individual's mental age is between 3 and 7 years").

Over time, the eugenics movement lost support and was repudiated. BIOETHICS IN HISTORICAL PERSPECTIVE at 11; Lisa Powell, Note, *Eugenics and Equality: Does the Constitution Allow Policies Designed to Discourage Reproduction Among Disfavored Groups?*, 20 YALE L. & POL'Y REV. 481, 482–89 (2002); *see* Eric M. Jaegers, Note, *Modern Judicial Treatment of Procreative Rights of Developmentally Disabled Persons: Equal Rights to Procreation and Sterilization*, 31 U. LOUISVILLE J. FAM. L. 947, 956 (1992) ("Beginning in the 1930s and 1940s, a variety of factors initiated a gradual decline in support for eugenic theories. First, as scientific understanding of mental retardation became more sophisticated, researchers were able to disprove or discredit many premises upon which eugenics was based.").

Nonetheless, references to Goddard's tier system continue to be included in definitions for these terms in dictionaries published decades later. *See, e.g.*, THE AMERICAN HERITAGE COLLEGE DICTIONARY 692 (Houghton Mifflin Co., 4th ed. 2007) (defining "imbecile" as "person of moderate to severe mental retardation having a mental age from three to seven years"); WEBSTER'S NEW WORLD COLLEGE DICTIONARY 723 (Houghton Mifflin Harcourt Publishing Co., 5th ed. 2014) (defining "idiot" as "disabled person mentally equal or inferior to a child two years old"); *Id.* at 726 (defining "imbecile" as "disabled person mentally equal to a child between three and eight years old"); *id.* at 952 (defining "moron" as "disabled person mentally equal to a child between eight and twelve years old: an obsolescent term"); *but see id.* at 726 (also defining "imbecile" as "very foolish or stupid person") *and* THE OXFORD ENGLISH DICTIONARY 670 (Clarendon Press, 2d ed. 1989) (defining "imbecile" as follows: "In general sense: Weak, feeble; esp. feeble of body, physically weak or impotent.").

Thus, dictionary definitions that describe an "imbecile" as having a mental age between three and seven—including the 1991 dictionary definition—are referring to this three-tier classification system conceptualized by Goddard.

**C. How the 1991 dictionary definition became incorporated into administrative and judicial analysis of qualifications for lifetime-income benefits**

The mental-age based "imbecility" definition was first used in the context of a workers' compensation claim in 1996. *See* Appeal No. 961340, 1996 WL 487735 (Tex. Work. Comp. Comm'n Aug. 21, 1996). There, the administrative appeals panel noted the lack of a statutory definition of "imbecility" and looked to Webster's Ninth New Collegiate Dictionary, dated 1991, for insight. *Cf. Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) (stating that court will look to dictionaries and other sources to determine common, ordinary meaning of statutory terms left undefined). That 1991 dictionary defined "imbecility" as the quality or state of being an imbecile; it defined "imbecile" as "a mentally deficient person, especially a feebleminded person having a mental age of three to seven years and requiring supervision in the performance of routine daily tasks or caring for himself." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991). That appeals panel decision and its age-specific definition was later quoted in another appeals decision. *See* Appeal No. 020660, 2002 WL 971165, at *1 (Tex. Work. Comp. Comm'n Apr. 19, 2002).

Meanwhile, some of the other states with "imbecility" as the standard in their lifetime-income-benefits statutes were adopting much broader definitions. In *Barnett v. Bromwell, Inc.*, 366 S.E.2d 271 (Va. Ct. App. 1988) (en banc), that court

noted that "imbecility" was an "obsolete" medical term and adopted a "functional," "non-technical" approach to defining it. *Id.* at 272–74. The court defined the term to mean "an irreversible brain injury which renders the employee permanently unemployable and so affects the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes . . . ." *Id.* at 274.

Likewise, Michigan adopted a general definition in *Redfern v. Sparks-Withington Co.*, 268 N.W.2d 28, 37 (Mich. 1978), holding as follows:

> We conclude that . . . a worker's intellectual impairment is "imbecility" if he suffers severe cognitive dysfunction . . . . [C]ognitive dysfunction is "severe" if it affects the quality of the worker's personal, non-vocational life in significant activity comparably to the loss of two members or sight of both eyes [another basis for qualifying for lifetime income benefits in some workers' compensation statutes], and is incurable if it is unlikely that normal functioning can be restored.

*Id.* at 37.

The Texarkana Court of Appeals compared the Virginia court's definition to the 1991 dictionary definition in *National Union Fire Insurance Co. v. Burnett*, 968 S.W.2d 950 (Tex. App.—Texarkana 1998, no pet.). After discussing these two alternative approaches to defining 'imbecility," the court determined that neither was helpful to answer the issue before it: whether the undefined statutory term "incurable insanity" included a diagnosis of depression without psychosis. *Id.* at 956.

18

The 1991 dictionary definition was referenced again in 2007 by the Beaumont Court of Appeals. *See Liberty Mut. Ins. Co. v. Camacho*, 228 S.W.3d 453 (Tex. App.—Beaumont 2007, pet. denied). Amerisure relies heavily on *Camacho*, asserting that it was "a similar case concerning entitlement to lifetime income benefits due to imbecility" and that the definition of imbecility that was used in that case "is the same definition" applied to deny Chamul's benefits.

In *Camacho*, the Beaumont Court of Appeals noted that the jury had been instructed that an "imbecile" is "a mentally deficient person, especially a feebleminded person having a mental age of three to seven years and requiring supervision in the performance of routine daily tasks or caring for himself." 228 S.W.3d at 461. But the *Camacho* court was not asked to determine whether the age-specific definition was legally correct or the trial court erred by supplying that definition to the jury. *See id.* Instead, the issue was whether a different jury instruction was erroneous: that the jury was to "give no special weight" to the decision of the Texas Workers' Compensation Commission in its deliberations. *Id.* at 459.

Just three years ago, these competing definitions were compared again by another workers' compensation appeals panel. *See* Appeal No. 121131-s, 2012 WL 12359072 (Tex. Work. Comp. Comm'n Aug. 27, 2012). That panel discussed that the hearing officer in the underlying contested hearing had noted the 1991

dictionary definition of "imbecility" and compared it to the more general definition found in the Virginia *Barnett* opinion. *See id.* at *3. Without endorsing either approach over the other, the panel concluded that the hearing officer did not err by determining that the claimant was entitled to lifetime-income benefits. *See id.*

Based on *Camacho* and these earlier appeals-panel decisions, Amerisure argues that "imbecility," in the context of a lifetime-income-benefits claim, means "a mentally deficient person, especially a feebleminded person having a mental age of three to seven years and requiring supervision in the performance of routine daily tasks or caring for himself." Amerisure reads this definition narrowly to require that the claimant establish a mental age between three and seven years.

## D.    Overly narrow, age-specific definition does not control

Amerisure obtained summary judgment that Chamul did not meet the definition of "imbecility" in the trial court. The trial court's holding was explicitly based on the narrow definition urged by Amerisure and adopted by the hearing officer. We conclude that the trial court erred by granting summary judgment to Amerisure. In doing so, we reject the narrow definition that would place a burden on claimants to establish a mental age of between three and seven years for three reasons. First, the 1991 dictionary from which the narrow definition was obtained was not an appropriate source to discern the meaning of a term incorporated into a statute more than 70 years earlier. Second, the mandate that the workers'

compensation statute be liberally construed to confer benefits upon injured workers suggests that Section 408.161 of the Labor Code should not be read to require proof of a mid-range mental age—a result achieved only through the most narrow reading of the statute and the definition possible. *See Lujan*, 756 S.W.2d at 297. Third, applying the 1991 dictionary definition would lead to absurd results and, therefore, must be rejected.

### 1. Consulting a dictionary to understand the common meaning of a statutory term

The term "imbecility" has been in the Labor Code for almost a century, always without an assigned definition. *See Lumbermen's Reciprocal Ass'n*, 258 S.W. at 269. It is appropriate to reference a dictionary to discern the common, ordinary meaning of a statutory term that has been left undefined. *See Jaster*, 438 S.W.3d at 563. However, not all dictionaries are equal.

"In the absence of a specific amendment, a statute should be given the meaning which it had when enacted." *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981) (noting that statute in question was adopted in 1947 and, therefore, looking to dictionary definition at that time); *cf. Porter v. State*, 996 S.W.2d 317, 320 (Tex. App.—Austin 1999), *supplemented*, 65 S.W.3d 72 (Tex. App.—Austin 1999, no pet.) (examining "the meaning the statute had when it was enacted"). This is because a dictionary published close in time to the enactment of the legislation is a superior

source for discerning the common, ordinary understanding of the term at the time it was incorporated. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXT 419 (Thomson/West, 1st ed. 2012). A dictionary published 70 years later is not as elucidating. Accordingly, we must consider other dictionaries published closer in time to the enactment of this legislation.

Contemporaneous dictionaries included more generalized definitions and did not limit "imbecility" to a mid-mental-age range. The 1910 edition of Black's Law Dictionary provides this general definition of "imbecility":

> A more or less advanced decay and feebleness of the intellectual faculties; that weakness of mind which, without depriving the person entirely of the use of his reason, leaves only the faculty of conceiving the most common and ordinary ideas and such as relate almost always to physical wants and habits . . . the test of legal capacity in this condition, is the stage to which the weakness of mind has advanced, as measured by the degree of reason, judgment, and memory remaining.

BLACK'S LAW DICTIONARY 632 (2nd ed. 1910). This definition remained in effect for more than 40 years. *See* BLACK'S LAW DICTIONARY (4th ed. 1951). Other contemporaneous dictionaries defined "imbecility" in similar, general terms:

22

| | |
|---|---|
| A DICTIONARY OF MEDICAL SCIENCE (1903) | Weakness of intellect; nearly allied to idiocy |
| BOUVIER'S LAW DICTIONARY 1492 (West Publishing Co. 1914) | A form of mental disease consisting in mental deficiency, either congenital or resulting from an obstacle to the development of the faculties supervening in infancy. Idiocy. |
| 2 BENJAMIN W. POPE, LEGAL DEFINITION 707 (1919) | destitute of strength, either of body or of mind,—weak, feeble, impotent, decrepit |
| WEBSTER'S COLLEGIATE DICTIONARY (G. & C. Merriam, 3d ed. 1920) | weakness, esp. of mind; . . . foolishness; absurdity; fatuity |
| JAMES A. BALLENTINE, A LAW DICTIONARY 218 (1923) | feebleness of mind |

Chamul refers us to an even more recent definition of "imbecility." *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "imbecile" as "person afflicted with severe mental retardation"). But, like the 1991 definition on which Amerisure relies, this definition fails to elucidate the meaning of the term when it was included in the workers' compensation statute.

Because we are to consider the definition of the term when it was included in the challenged statute, we rely more on the general definitions quoted above, which date from 1903 to 1923, than on the age-specific definition on which Amerisure relies from 1991.

## 2. Liberal construction suggests a broader definition

"The primary purpose of the Texas Workers' Compensation Act is to benefit and protect injured employees." *Barchus v. State Farm Fire & Cas. Co.*, 167 S.W.3d 575, 578 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (analyzing predecessor statute, rejecting argument that "injury to the skull" required "fracture" of skull, and concluding that liberal construction of statute prohibits reading into statute requirement that skull be fractured). Thus, when a fair reading permits it, the Act is liberally construed to confer benefits upon injured workers. *See Lujan*, 756 S.W.2d at 297.

Contrary to this requirement, Amerisure is arguing for the most restrictive reading possible of the definition it proposes. The 1991 definition is "a mentally deficient person, *especially* a feebleminded person having a mental age of three to seven years . . ." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991) (emphasis added). The definition does not limit the term to *only* those with a mental age of three to seven; it says, instead, *especially* those of that category, suggesting that others also would fit within the description.

While we have not found a case directly on point, in our view, the term "especially" is analogous to "including" and signals that the statutory provision is broader in scope than the particular example that follows the term of enlargement. *See In re E.C.R.*, 402 S.W.3d 239, 246 n.6 (Tex. 2013) (noting that terms of

enlargement within statutory definitions indicate that lists are nonexclusive; specifically analyzing provisions using term "including"); *Tex. W. Oaks Hosp. v. Williams*, 371 S.W.3d 171, 179 (Tex. 2012) (holding that Legislature's use of term "including" meant that statutory definition was nonexclusive). Attaching a narrow definition to limit a benefit without statutory text to support that interpretation violates the rule of liberal construction. *See Barchus*, 167 S.W.3d at 580. Therefore, even if we were to conclude that the 1991 definition accurately states the meaning of "imbecility" in the context of a lifetime-income-benefit award, the definition, itself, leaves open the possibility that someone with a mental age higher than seven years of age might qualify.

### 3. Applying the 1991 dictionary definition would lead to absurd results

If we were to accept Amerisure's definition and hold that "imbecility" refers to individuals with a mental age between three and seven, this would exclude from the statute's application the two other tiers of the three-tier classification system: "idiots" and "morons." Doing so would lead to the absurd result that lifetime-income benefits would be available to an employee who suffered a traumatic brain injury serious enough to leave her at a functional age of three to seven years but denied to a worker more seriously injured and left at a functional age of below three years of age. Because such an absurd result could not have been intended by the Legislature, we must reject it. *See City of Rockwall v. Hughes*, 246 S.W.3d 621,

25

625–26 (Tex. 2008) (stating that statutory terms are given their plain and common meaning unless such a construction leads to absurd results).

The Virginia Court of Appeals also noted the absurdity of this result in its en banc decision in *Barnett*, while construing "imbecility" in that state's workers' compensation statute:

> To interpret the term "imbecility" to mean only those employees whose I.Q.s fall precisely within the range of 20 to 49 would lead to the absurd result that an employee with an I.Q. of less than 20 would not fall within the definition of the term. We do not find such a restrictive meaning necessarily inherent in the term, nor do we attribute such an unreasonable result to an intent by the legislature.

*Barnett*, 366 S.E.2d at 274; *see Burnett*, 968 S.W.2d at 955 (discussing *Barnett*).

We agree that a definition that denies lifetime-income benefits to the most severely injured worker but permits them for those with mid-level deficits does not comport with legislative intent. To the extent past appeals panels have relied on this narrow 3-to-7-years definition, we are not bound by those interpretations given the absurd results that would follow. *See Barchus*, 167 S.W.3d at 578 (stating that, while construction of statute by administration charged with its enforcement is entitled to thoughtful consideration, it is not binding on courts and no presumption of validity attaches to it); *see also Fulton v. Associated Indem. Corp.*, 46 S.W.3d 364, 370 (Tex. App.—Austin 2001, pet. denied) ("We liberally construe workers' compensation legislation to carry out its evident purpose of compensating injured workers and their dependents. An agency may not supply by implication

26

restrictions on an employee's rights that are not found in the plain language of the Act.").

We conclude that the 1991 definition must be rejected because it has not been shown to mirror the understanding of the term when it was incorporated into the legislation, is overly narrow, and would lead to absurd results.

**E.      The trial court erred by granting summary judgment based on the narrow, age-specific definition**

The hearing officer stated in the decision denying lifetime-income benefits that Chamul "likely meets" the definition of imbecility except for the "mental age of three to seven years" requirement. The trial court expressly stated that it applied a narrow "imbecility" definition, which required a mental age of three to seven years, in its determination of the summary-judgment motions. We have rejected that narrow definition.

The record reveals that there was a great deal of evidence presented to the hearing officer and attached to the summary-judgment motions concerning the severity of Chamul's head injury and resulting impairment. While his treating physician was hesitant to describe him as having a functional age of three to seven years old,[5] she did describe in detail how his injury has negatively impacted his

---

[5]    In Chamul's second issue, he contends that the trial court erred by finding that Dr. Ivanhoe's affidavit is a sham affidavit. Amerisure had argued that Dr. Ivanhoe's affidavit "appear[ed] to be a sham affidavit created exclusively for the purpose of attempting to create a fact issue where one does not exist." To the extent any

ability to care for himself, perform work and non-work related tasks, and communicate.

The record also contains a report from Dr. Hite, an affidavit from rehabilitation expert Wallace Stanfill, and an affidavit from Chamul's father and caretaker, Felix Chamul. In Dr. Hite's report, he explained that Chamul's condition will not improve and that he will need a caretaker for the rest of his life. Likewise, Stanfill explained in his affidavit that "while Mr. Chamul is marginally functional in many basic areas, he is not considered to be cognitively able to engage in any degree of competitive work, even unskilled employment. His current level of functioning would [be] at best more in keeping sheltered employment." Finally, Felix Chamul, the father and caretaker of Francisco Chamul, stated in his affidavit that Chamul is unable to manage his medical and financial affairs and is unemployable.

There is, however, contrary evidence in the record. Dr. Brylowski, the neuropsychiatrist retained by Amerisure, testified that Chamul "did not sustain any type of irreversible brain injury which would rise to the level of rendering him

---

conflict between her affidavit and testimony leads to the conclusion that the affidavit qualifies as a sham affidavit, that conclusion would be limited to that part of the affidavit that conflicts: Dr. Ivanhoe's statement that Chamul's cognitive deficits "results in him having the mental capacity and behavior of a three to seven year old child." The remainder of the affidavit remains relevant and admissible. *See Farroux v. Denny's Rests., Inc.*, 962 S.W.2d 108, 111 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (adopting "sham affidavit" doctrine and analyzing whether single paragraph in affidavit presented fact issue).

permanently unemployable because of eliminating his ability to engage in a range of usual cognitive processes." He further stated that any cognitive problems could be treated and managed to help Chamul reintegrate into the workplace.

Based on the competing summary-judgment evidence, we conclude that a fact issue exists as to whether the deficiencies caused by the traumatic brain injury Chamul suffered in the course of his employment meet the requirements of "imbecility" under the statute. Because this is a material fact issue, summary judgment for Amerisure was erroneous.

We sustain Chamul's first issue.

## Conclusion

When faced with competing summary judgments, the general rule is that an appellate court should determine all questions presented and render the judgment that the trial court should have rendered. *Patient Advocates of Tex.*, 136 S.W.3d at 648. Here, though, a fact issue exists that precludes summary judgment for either party. *See Coker v. Coker*, 650 S.W.2d 391, 394–95 (Tex. 1983). Accordingly, the trial court's order granting Amerisure's motion for summary judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.


Harvey Brown
Justice

29

Panel consists of Justices Jennings, Higley, and Brown.