2005 VT 98

## State of Vermont v. Christopher Messier

[885 A.2d 1193]

No. 03-482

Present: **Dooley, Johnson, Skoglund and Reiber, JJ., and Allen, C.J. (Ret.),
Specially Assigned**

Opinion Filed August 19, 2005

*Heidi H. Woessner*, Windsor County Deputy State's Attorney, White River Junction, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Henry Hinton*, Appellate Attorney, and *Dawn Matthews*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant Christopher Messier appeals his conviction in the Windsor Circuit Court of reckless endangerment and disorderly conduct. Defendant presents three issues on appeal: (1) whether 13 V.S.A. § 1025 requires proof of a firearm's operability; (2) whether defendant was substantially prejudiced when a witness offered testimony at trial regarding defendant's admission to the witness, the content of which the State never disclosed to defense counsel; and (3) whether defendant was substantially prejudiced when the same witness referred to a prior plea agreement. In sustaining defendant's conviction, we find that any prejudice arising from the witness's testimony was cured by the trial court's prompt

curative instruction to the jury. We further conclude that the State provided sufficient evidence of operability of the gun brandished by defendant. Therefore, we affirm defendant's conviction.

¶ 2. On the evening and early morning of October 5-6, 2002, defendant attended a benefit dance in the town of Sharon, Vermont, with his wife and a friend, Roberta Nason. After four to five hours at the dance, the party of three and another friend, Fay-Ann Manning, returned to stay the night at Nason's home in South Royalton. Nason went to bed between 1:30 and 2:00 a.m., shortly after their return. Manning stayed up to talk with defendant and his wife for about an hour until defendant, who had been drinking all night, abruptly became angry and went outside. Manning could later hear defendant's voice among several people yelling outside. The noise eventually woke Nason as well.

¶ 3. Meanwhile, Richard Whitham and David Slater were returning to their cars at Crossroads, a bar in South Royalton, located roughly 100 yards downhill from Nason's trailer. From the Crossroads parking lot, Whitham heard someone yelling that he wanted to kill Scott Durkee, the bar's owner. Weeks earlier Durkee and defendant had exchanged words at the Tunbridge World's Fair; defendant apparently still harbored anger toward Durkee, who several years earlier had asked defendant not to return to Crossroads after repeated disturbances.

¶ 4. Whitham drove his truck up the hill to investigate and saw someone standing in the bushes with what looked like a gun pointed toward him, so he quickly returned to the bar to report what he had seen. After calling the police, Durkee joined Whitham and Slater in the Crossroads parking lot, where they could see someone moving on the hill above and could hear a man shouting. Whitham and Slater decided to confront the man, and charged up the hill toward Nason's trailer.

¶ 5. As they neared the trailer, both men recognized defendant, whom they had known for some years. Both recalled that defendant was holding a shotgun, which Slater testified was pointed in his direction. Slater knocked the gun away from defendant, and the men fought outside the trailer until someone from Crossroads yelled that the police were on their way. Slater and Whitham left before the police arrived. After speaking briefly with Durkee, the troopers drove to Nason's home, where they found defendant hiding under the trailer. Once inside, they discovered a shotgun, which Manning and Nason identified as the firearm defendant had that night.

¶ 6. Defendant was convicted of disorderly conduct and reckless endangerment and acquitted of driving under the influence following a

two-day jury trial. On appeal, defendant contends that he was substantially prejudiced by two statements in Slater's testimony, and that the trial court erred when it failed to grant defendant's motion for a mistrial made in response to these statements. Defendant also challenges the sufficiency of the State's evidence demonstrating that the firearm was operable.

¶ 7. First, we reject defendant's argument that the State failed to demonstrate that the gun was operable, as required by 13 V.S.A. § 1025. In 2000, the Legislature amended § 1025 to add the emphasized language to the statute's last sentence:

> A person who recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury shall be imprisoned for not more than one year or fined not more than $1,000.00 or both. Recklessness and danger shall be presumed where a person knowingly points a firearm at or in the direction of another, whether or not the actor believed the firearm to be loaded, *and whether or not the firearm actually was loaded.*

13 V.S.A. § 1025 (Cum. Supp. 2004) (emphasis added); see 1999, No. 149 (Adj. Sess.), § 3 (adding underlined language).

¶ 8. At this point, some background on our decisions concerning § 1025 is instructive. Under our original construction of § 1025, before the emphasized language above was inserted, whether a firearm pointed at another person was loaded or otherwise operational was irrelevant. *State v. Cushman*, 133 Vt. 121, 124, 329 A.2d 648, 650 (1974). In *Cushman*, we noted that in enacting the statute, "the Legislature's intent was to proscribe the pointing of all firearms at others." *Id.* Thus, we reasoned, "the danger to the victim is presumed once the jury decides that the defendant pointed a firearm in the direction of the victim." *Id.* at 125, 329 A.2d at 651.

¶ 9. In *State v. McLaren*, 135 Vt. 291, 376 A.2d 34 (1977), we overruled *Cushman*'s construction of § 1025, determining that the presumption of recklessness could not be construed to make irrelevant the actual dangerousness of the firearm itself. *Id.* at 293, 376 A.2d at 36. To that end, we found that "the Legislature ... intended to proscribe conduct which would place the victim in actual danger of death or serious bodily injury, not mere apparent danger." *Id.* As such, "[w]hether the firearm was unloaded or was otherwise inoperative is an essential issue in determining whether the victim was placed in an objective state of danger of death or serious bodily harm." *Id.;* accord

*State v. Emilo*, 146 Vt. 277, 278, 501 A.2d 1188, 1189 (1985) (affirming defendant's conviction under § 1025 where defendant pointed a loaded, though uncocked, firearm toward a police officer). In other words, *McLaren* required the State to prove that the firearm in question was loaded and operational.

¶ 10. The 2000 amendment explicitly overruled *McLaren*'s holding requiring the State to prove a gun involved in an alleged violation of § 1025 was loaded in order to obtain a conviction. However, even after the amendment, the statute remains silent as to *McLaren*'s requirement that the State prove operability. In assessing the import of the amendment, two principles of statutory construction are relevant. First, "[w]e must presume that the Legislature made changes in the law in light of the relevant decisions of this Court, and with knowledge of prior legislation on the same subject." *Thayer v. Herdt*, 155 Vt. 448, 453, 586 A.2d 1122, 1125 (1990); accord *Heffernan v. Harbeson*, 2004 VT 98, ¶ 9, 177 Vt. 239, 861 A.2d 1149; *State v. Anair*, 123 Vt. 80, 81, 181 A.2d 61, 63 (1962); *Donoghue v. Smith*, 119 Vt. 259, 263-64, 126 A.2d 93, 96 (1956). At the time the Legislature considered and enacted the amendment, the "relevant decisions of this Court" included *McLaren*. The available legislative history also indicates that the Legislature was aware of *McLaren*. In particular, the decision was referenced during a House Judiciary Committee hearing, and it was acknowledged that the amendment was an attempt to change the result of the decision by allowing a charge under § 1025 whether or not the gun was loaded. Hearing on S.0214 Before House Judiciary Comm., 1999-2000 Bien. Sess. (Vt. Mar. 24, 2000). Thus, the Legislature was aware of *McLaren*'s holding requiring proof that a gun involved in a violation of § 1025 was loaded and operable when it amended the statute.

¶ 11. Second, we are mindful that "[p]rovisions of the original act or section which are repeated in the body of the amendment . . . are considered a continuation of the original law. . . . Thus, rights and liabilities accrued under the provisions of the original act which are reenacted are not affected by the amendment." *Slocum v. Dep't of Soc. Welfare*, 154 Vt. 474, 480, 580 A.2d 951, 955 (1990) (quotations omitted); see also *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 732 n.7 (2d Cir. 1994) (interpreting Vermont law and recognizing that "[w]here sections of a statute have been amended but certain provisions have been left unchanged, we must generally assume that the legislature intended to leave the untouched provisions' original meaning intact"). Putting this "rule of reenacted provisions" together with the presump-

tion that the Legislature was aware of *McLaren* when it amended the statute leads us to one conclusion: the amendment did not do away with *McLaren*'s requirement that the State demonstrate that a gun involved in a § 1025 violation was operable. Thus, we decline the State's invitation to read the operability requirement out of § 1025.*

¶ 12. Accordingly, we must assess defendant's argument that the district court erred in denying his motion for acquittal in which he argued that the State did not present sufficient evidence of the gun's operability. In reviewing the trial court's denial of defendant's motion for acquittal, we consider whether "the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." *State v. Turner*, 2003 VT 73, ¶ 7, 175 Vt. 595, 830 A.2d 122 (mem.) (quotations omitted). A judgment of acquittal is appropriate only if the State has failed to provide any evidence to support the verdict. *Id.*

¶ 13. Here, the State did provide sufficient evidence to support the verdict. Two witnesses testified consistently that they heard the ratcheting noise of the pump action of the gun that night. A state trooper also demonstrated the noise made by the gun's pump action on the stand. There were shells found in defendant's vehicle, and the incident took place during hunting season. Moreover, the gun itself was entered into evidence and available for the jury's inspection. As the State observed, defendant adduced no evidence that the gun was not operable, and the gun was not a rusty antique, like the weapon at issue in *Cushman*. Further, we agree with the State that nothing in our caselaw dealing with § 1025 suggests that the State must undertake ballistics or other laboratory testing in order to meet its burden on operability. Thus, we reject defendant's argument that the district court erred in denying his motion for acquittal.

---

* By expanding the scope of the crime to include unloaded weapons, the plain language of § 1025 now proscribes conduct that could place the victim in actual danger (if the gun is loaded), or merely apparent danger (if the gun is unloaded). The statute as amended is thus in some tension with *McLaren*'s rationale that the statute is "intended to proscribe conduct which would place the victim in actual danger of death or serious bodily injury, not mere apparent danger." 135 Vt. at 293, 376 A.2d at 36. In other words, the statute in its current form criminalizes some conduct that gives rise to apparent danger (pointing an unloaded but operable firearm) and not other such conduct (pointing an inoperable firearm).

¶ 14. Next, we reject defendant's argument that he was entitled to a new trial based on two of Slater's statements during the trial: (1) testimony concerning an apology defendant made to Slater following their altercation; and (2) a reference to a plea agreement Slater thought had been negotiated between defendant and the State. Defendant argues that the trial court's prompt curative instructions to disregard the two statements were insufficient to cure any resulting prejudice, and that the court should have granted a mistrial. We disagree.

¶ 15. The question before this Court regarding these two statements is whether the trial court committed reversible error when it denied defendant's motions for a mistrial. The disposition of a motion for mistrial is discretionary, and, as such, a claim of error can be supported only where the trial court's discretion was either totally withheld, or exercised on clearly untenable or unreasonable grounds. *State v. Potter*, 148 Vt. 53, 57, 529 A.2d 163, 166 (1987). Reversal is therefore appropriate only when the moving party demonstrates prejudice, which must be determined according to the facts of each case in the context of the entire proceeding. *Id.* at 58, 529 A.2d at 166. Furthermore, when reviewing the sufficiency of a curative instruction, in the absence of evidence to the contrary, this Court will presume that the jury has heeded the instruction and disregarded the improper remark. *State v. Foy*, 144 Vt. 109, 117, 475 A.2d 219, 224 (1984).

¶ 16. The first statement occurred during Slater's direct examination by the State. After describing the events at Nason's trailer, the State asked Slater whether he had seen defendant again that night, and Slater confirmed that he had. He testified that defendant came down to the Crossroads parking lot and said that "he was sorry and the gun wasn't loaded." Defendant immediately asked for a bench conference, during which he disclaimed any notice of the statement. The State indicated that it had learned of the statement only that morning before trial. Given that time frame, the court concluded that the State's nondisclosure did not rise to the level of misconduct, and refused to declare a mistrial. Instead, it immediately directed the jury to disregard the statement and excised it from the record. The court later denied defendant's motion for a new trial on this issue, finding no indication that the State acted out of maliciousness or bad motive, and abiding by the sufficiency of its curative instruction.

¶ 17. The second statement occurred during Slater's heated cross-examination by the defense. An exasperated Slater testified that he "thought it was over when they sent me a letter saying there was a

plea agreement or," after which defendant immediately moved for a mistrial. The court denied this motion as well, reasoning that it was clear that no plea existed. The court again directed the jury to disregard the statement as being nonresponsive to the question. In later denying defendant's motion for a new trial, the court described Slater's statement as a nonspecific, passing reference. It noted that the jury acquitted defendant of one charge, indicating it did not find guilt based upon the mention of any prior plea arrangement.

¶ 18. Reviewing Slater's first statement concerning defendant's undisclosed apology, we conclude that the trial court acted within its discretion when it denied defendant's motion. Defendant argues that he was substantially prejudiced to the extent that, from the juror's perspective, his alleged general statement of regret was tantamount to an admission of guilt, and contends that the trial court's instruction to the jury was insufficient to cure any prejudice arising from the remark. We disagree. Defendant has not demonstrated any incurable prejudice on this issue, and there is no evidence to suggest that the jury did not heed the court's curative instruction. Further, the second phrase of Slater's statement — defendant's alleged statement that the gun was not loaded — could not have caused any prejudice because defendant did not dispute that he brandished a gun during the incident.

¶ 19. We reach the same conclusion with respect to Slater's second statement. The inadvertent reference to a prior plea agreement raises a novel issue in our jurisprudence: specifically, whether such a reference should be deemed so prejudicial as to merit a per se rule requiring a mistrial, as defendant suggests, or whether the reference should be reviewed under the abuse of discretion standard, as is the case with other inadmissible evidence. See *State v. Jones*, 160 Vt. 440, 450-51, 631 A.2d 840, 847 (1993) (finding no abuse of discretion where court gave a curative instruction, and thus obviated any prejudice to defendant, in response to improper questions posed during State's cross-examination of defendant regarding uncharged sexual misconduct); *State v. Abbott*, 151 Vt. 618, 619-20, 563 A.2d 640, 641-42 (1989) (refusing to find abuse of discretion where trial court issued curative instruction to disregard witness's statement concerning a prior BAC test, the results of which had been suppressed prior to trial). While evidence of a guilty plea is inadmissible under Vermont Rule of Evidence 410, a per se rule requiring a mistrial at the very mention of the words would be unreasonable. Accordingly, we review the court's

response to Slater's second statement under the abuse of discretion standard.

¶ 20. Here, as with the other challenged testimony, the trial court declined to declare a mistrial, but promptly instructed the jury to disregard Slater's statement. Its decision was a proper exercise of its discretion. In *State v. Potter*, we held that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial after a witness indirectly referred to the fact that the defendant may have been incarcerated at some point immediately prior to the incident in question. 148 Vt. at 57-58, 529 A.2d at 166. We concluded that the district court's prompt curative instruction eliminated the need for a mistrial. *Id.* at 58, 529 A.2d at 166.

¶ 21. Here, the trial court also responded with an immediate curative instruction directing the jury to disregard Slater's statement about a plea agreement as nonresponsive. Additionally, the statement itself was unsolicited and vague — Slater did not refer to specific terms of any particular plea arrangement, or even that defendant had pled guilty. Furthermore, Slater was obviously mistaken in his belief that the matter was settled by a plea agreement, given that he was testifying in defendant's criminal trial at the time. Finally, the jury acquitted defendant of one of the charges, indicating that it performed its duty, uninfluenced by Slater's passing reference. Again, defendant has failed to demonstrate prejudice, and the record does not reflect that the trial court abused its discretion or that the jury disregarded the court's limiting instructions.

*Affirmed.*