NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 44

No. 2020-252

| | |
|---|---|
| John West | Supreme Court |
| | |
| | On Appeal from |
| v. | Commissioner of Labor |
| | |
| North Branch Fire District #1 | March Term, 2021 |

Michael A. Harrington, Commissioner

Robert D. Mabey of Kalter, Kalter & Mabey, PLC, Rutland, for Plaintiff-Appellant.

William J. Blake of Boxer Blake & Moore PLLC, Springfield, for Defendant-Appellee Berkley
  Risk Administrators Company, LLC.


PRESENT: Reiber, C.J., Robinson, Carroll and Cohen, JJ., and Dooley, J. (Ret.),
          Specially Assigned


¶ 1.    **CARROLL, J.**   Claimant John West appeals a decision of the Commissioner of the Vermont Department of Labor concluding that the 2014 amendment to 21 V.S.A. § 644(a)(6) does not apply retroactively. West argues that, contrary to the Commissioner's conclusion, the 2014 amendment to § 644(a)(6) applies retroactively because it did not create any new substantive rights. We conclude that the 2014 amendment applies retroactively and therefore reverse and remand.

¶ 2.    The following facts are undisputed. In March 2013, West fell fifteen to twenty feet while working in the course of his employment for North Branch Fire District. He was transported to the hospital and treated for extensive injuries, which included a rib fracture, epidural and

subdural hematoma, parenchymal and subarachnoid hemorrhage along the temporal lobe, multiple skull fractures, and seizure-like activity. West was discharged from the hospital twelve days later.

¶ 3. In September 2014, West relocated to Florida, and at some point thereafter, began working at the Freedom Boat Club. Between 2014 and 2016, several different physicians provided conflicting opinions on the level of West's permanent impairment. In February 2016, Dr. Joseph Kandel conducted an independent medical examination (IME) at North Branch's request. At a deposition in September 2018, Dr. Kandel testified that it would be accurate to say that "West suffered an injury to the skull resulting in [a] severe traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities."

¶ 4. That October, West filed a request for a formal hearing, asserting that he was permanently and totally disabled under § 644(a)(6). Between the date of West's injury and his request for a formal hearing, however, the Legislature amended § 644(a)(6). As originally enacted in 1978, § 644(a)(6) defined total and permanent disability as "an injury to the skull resulting in incurable imbecility or insanity." 1977, No. 182 (Adj. Sess.), § 10. In 2014, the Legislature passed Act 96, which amended § 644(a)(6) to define total and permanent disability as "an injury to the skull resulting in severe traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities." 2013, No. 96 (Adj. Sess.), § 137. In the purpose statement accompanying Act 96, the Legislature explained that it sought "to replace offensive statutory terms with language that recognizes persons as opposed to their disabilities" and that the changes in terminology should not "be construed to alter the substance or effect of existing law or judicial precedent." Id. § 1.

¶ 5. In January 2019, North Branch filed a motion for summary judgment arguing that the pre-amendment version of § 644(a)(6)—which defined total and permanent disability as "an injury to the skull resulting in incurable imbecility or insanity"—applied to West's claim because that was the law on the date of his injury in March 2013. Further, North Branch argued that the

2

2014 amendment did not apply retroactively because despite the Legislature's stated purpose, the amendment created a substantive change in the law. In any event, because West was employed, North Branch maintained that he was not totally and permanently disabled under either version of § 644(a)(6). As proof of West's current employment, North Branch attached several exhibits to its motion for summary judgment that contained photos of West at work at the Freedom Boat Club.

¶ 6. In opposition, West argued that the 2014 amendment to § 644(a)(6) applied retroactively because the Legislature's intent—as indicated by the purpose statement in Act 96— was not to change substantive rights, but to replace offensive statutory terminology with more respectful language. 2013, No. 96 (Adj. Sess.), § 1. In addition, West argued that summary judgment should be denied based on Dr. Kandel's September 2018 deposition testimony that "West suffered an injury to the skull resulting in [a] severe traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities."

¶ 7. In June 2019, the Commissioner denied North Branch's motion for summary judgment.[1] Although the Commissioner acknowledged that the Legislature's stated intent in passing Act 96 and amending § 644(a)(6) was to replace offensive statutory terms, and not to make any substantive change to existing law, it concluded that the Legislature "unintentionally changed the substance of" § 644(a)(6). The Commissioner explained that the language of the 2014 version of § 644(a)(6) was "significantly different" than the pre-amendment version. Specifically, the Commissioner noted that the term "physical disabilities" in the 2014 version had "no antecedent in the pre-amendment" version of the statute. In addition, citing Vermont case law and Wimp v. American Highway Technology, 360 P.3d 1100 (Kan. Ct. App. 2015), the Commissioner reasoned

---

[1] In doing so, the Commissioner noted that North Branch sought either a declaratory judgment or summary judgment as to which version of § 644(a)(6) applied to West's claim. Because the Commissioner reasoned that it would reach the retroactivity question "in the course of interpreting and applying the law relevant to [North Branch's] summary judgment motion," it declined to rule on North Branch's motion for declaratory judgment.

3

that the Legislature's replacement for imbecility—severe cognitive disability—was inconsistent with the historical definition of imbecility, which refers to a person with a significantly diminished IQ. Because the 2014 amendment created a substantive change, the Commissioner determined that West's claim was governed by the pre-amendment version of § 644(a)(6).

¶ 8. Applying the pre-amendment "incurable imbecility or insanity" standard, the Commissioner concluded that it could not grant summary judgment because disputed facts remained about the scope of West's impairment. Although the Commissioner acknowledged Dr. Kandel's deposition testimony, it found that his testimony was "conclusory and insufficient to the form the basis for a finding that [West] is, or is not, permanently and totally disabled" in part because Kandel "did not provide any basis for his opinion that would allow evaluation of its persuasiveness." In addition, the Commissioner concluded that North Branch's evidence demonstrating that West was employed was not relevant because under § 644(a), an injured worker is deemed permanently and totally disabled if he or she has one of the enumerated injuries, regardless of current employment.

¶ 9. Following this decision, the Commissioner granted West permission to file an interlocutory appeal on the question of which version of § 644(a)(6) applied to his claim. We dismissed the appeal, however, concluding that it was improvidently granted because it did not meet the criteria outlined in Vermont Rule of Appellate Procedure 5(b)(1) for interlocutory appeals. In February 2020, Dr. Nancy Hebben conducted an IME of West and concluded that "under no definition" of which she was aware did "West suffer from incurable imbecility or insanity" because his "objective neuropsychological test results [did] not reveal any cognitive . . . impairment" or mental illness.

¶ 10. West subsequently moved for summary judgment in North Branch's favor, explaining that he did not want to proceed with a formal hearing where he had to prove that he was either insane or an imbecile because those terms are vague, ambiguous, offensive, and highly

4

disrespectful. He accordingly requested that the Commissioner grant summary judgment so that he could appeal the Commissioner's earlier decision concluding that the 2014 amendment to § 644(a)(6) did not apply retroactively. In opposition, North Branch argued that to grant summary judgment in its favor, West had to concede, or the Commissioner had to determine, that West would not be able to prevail on a claim for total and permanent disability under the applicable legal standard. North Branch accordingly requested that the Commissioner grant summary judgment based on Dr. Hebben's February 2020 IME, in which she concluded that West was not totally and permanently disabled under any definition of incurable imbecility or insanity.

¶ 11. The Commissioner granted West's motion, reasoning that North Branch was entitled to summary judgment because West had simply conceded that he could not establish a prima facie case for total and permanent disability under the pre-amendment version of § 644(a)(6). As a result, the Commissioner did not consider or rely upon Dr. Hebben's IME.

¶ 12. On appeal, West argues the Commissioner erred in concluding that the 2014 amendment to § 644(a)(6) does not apply retroactively. He asserts that the amendment applies retroactively because in the purpose statement accompanying Act 96, the Legislature expressly stated that the 2014 amendment to § 644(a)(6) did not make any substantive changes to existing law. In response, North Branch argues that the amendment is a substantive change, and—even if it is not—that West waived his right to total and permanent disability under § 644(a)(6) by asking the Commissioner to grant summary judgment in its favor. In any event, North Branch maintains that West is not totally and permanently disabled under either version of § 644(a)(6) because he is gainfully employed.

¶ 13. We review summary judgment decisions de novo, applying the same standard as the trial court. Lyons v. Chittenden Cent. Supervisory Union, 2018 VT 26, ¶ 12, 207 Vt. 59, 185 A.3d 551. Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P.

5

56(a). "In applying this standard, we give the nonmoving party the benefit of all reasonable doubts and inferences." In re Miller Subdivision Final Plan, 2008 VT 74, ¶ 8, 184 Vt. 188, 955 A.2d 1200 (quotation omitted).

¶ 14.   We conclude that the 2014 amendment applies retroactively because it is a remedial change and a modern, more respectful articulation of the incurable imbecility or insanity standard. This conclusion rests on the Legislature's express statement that the 2014 amendment was not a substantive change, the fact that we have not yet interpreted § 644(a)(6), and other courts' interpretations of the terms imbecility and insanity in the workers' compensation context.   In addition, we conclude that West did not waive his right to seek total and permanent disability under § 644(a)(6) by asking the Commissioner to grant summary judgment in North Branch's favor. Finally, we conclude that North Branch is not entitled to summary judgment because disputed facts remain about the scope of West's impairment.

I.  Retroactivity

¶ 15.   The primary issue in this appeal is whether the 2014 amendment to § 644(a)(6) applies retroactively.   "The controlling law in determining the retroactive effect of a statutory amendment is 1 V.S.A. § 214 . . . ." Sanz v. Douglas Collins Constr., 2006 VT 102, ¶ 7, 180 Vt. 619, 910 A.2d 914 (mem.).   It provides that a statutory amendment shall not affect "any right, privilege, obligation, or liability acquired, accrued, or incurred prior to the effective date of the amendment."   1 V.S.A. § 214(b)(2).   Accordingly, the question under § 214(b)(2) is whether "retroactive application would affect the substantive rights of the parties." Smiley v. State, 2015 VT 42, ¶ 18, 198 Vt. 529, 117 A.3d 441.  In determining whether an amendment is substantive, we consider the statute as a whole. 2 S. Singer, Sutherland Statutory Construction § 41:4 (7th ed. 2020).

¶ 16.   Applying § 214(b)(2), we have recognized that so-called procedural or remedial amendments may apply retroactively because they do not affect substantive rights. Smiley, 2015

6

VT 42, ¶ 17.  A statutory amendment is considered procedural if it controls "only the method of obtaining redress or enforcement of rights."  Id. ¶¶ 18, 19 (quotation omitted) (concluding that agency rule could be applied retroactively because it affected "only procedural rights and obligations of the parties in that it dictates the mode or method of proceeding to enforce substantive rights").  By contrast, a remedial change, for retroactivity purposes, refers to an amendment that "confirms existing rights by curing defects, mistakes, and omissions."  3 S. Singer, Sutherland Statutory Construction § 60:5 (8th ed. 2020) ("Courts may use the terms 'ameliorative,' 'curative,' 'declarative,' 'interpretive,' and 'clarifying' to mean 'remedial' for retroactivity purposes."); see, e.g., Myott v. Myott, 149 Vt. 573, 576, 547 A.2d 1336, 1338 (1988) (concluding that statutory amendment was remedial because although it "require[d] the court to look at factors that were formerly optional and specifie[d] the relevant factors in greater detail[,]" "the overall standard— the best interests of the child—[was] the same before and after the statutory amendment").

¶ 17.  Here, North Branch argues that the 2014 amendment to § 644(a)(6) does not apply retroactively because the amendment has nothing to do with procedure.  The question, however, is whether, as the Legislature claims, the 2014 amendment is remedial—i.e., it just replaces the "incurable imbecility or insanity" standard with more respectful language—or whether the amendment substantively changed § 644(a)(6).  Relying on basic principles of statutory interpretation, the Commissioner concluded that the 2014 amendment to § 644(a)(6) amounted to a substantive change because the language of 2014 amendment was "significantly different" than the pre-amendment version.  It reasoned that the Legislature's replacement for imbecility—severe cognitive disability—was inconsistent with the historical definition of imbecility.  In addition, the Commissioner explained that by including "physical disabilities" in the 2014 amendment, the Legislature broadened the scope of § 644(a)(6) because the word "physical" had no corresponding antecedent in the pre-amendment version.

7

¶ 18.    West argues that the Commissioner erred in concluding the 2014 amendment was substantive because the goal of statutory interpretation is to give effect to the Legislature's intent, and the Legislature made its intent clear in the purpose statement of Act 96 that the amendment to § 644(a)(6) did not change substantive law.  Because we have never interpreted the pre-amendment version of § 644(a)(6), West argues that the Legislature has simply clarified what the phrase "incurable imbecility or insanity" has always meant.  North Branch asserts, however, that we should defer to the Commissioner's conclusion that the 2014 amendment to § 644(a)(6) does not apply retroactivity because the Legislature has given the Department of Labor express authority to interpret and apply workers' compensation laws.  On the merits, North Branch argues that the Commissioner correctly concluded that, notwithstanding the Legislature's contrary statement of intent, the 2014 amendment substantively changed § 644(a)(6).

## A.  Deference

¶ 19.    North Branch asserts that we should defer to the Commissioner's conclusion that the 2014 amendment to § 644(a)(6) does not apply retroactively.  "To preserve the appropriate separation of judicial and executive powers, we presume that judicial review of administrative decisions is deferential absent a clear statement of contrary intent."  Town of Victory v. State, 2004 VT 110, ¶ 16, 177 Vt. 383, 865 A.2d 373.  "We have long extended this principle of deference to agency interpretation of statutes which the Legislature has entrusted to their administration."  In re Williston Inn Grp., 2008 VT 47, ¶ 12, 183 Vt. 621, 949 A.2d 1073 (mem.).  Based on these principles, we typically defer to the Commissioner's interpretation of workers' compensation laws. Travelers Indem. Co. v. Wallis, 2003 VT 103, ¶ 14, 176 Vt. 167, 845 A.2d 316 (explaining that we defer to Commissioner because "[t]he Legislature has entrusted the administration of the workers' compensation laws to the Commissioner and the Commissioner necessarily has developed expertise in this administration" (citation omitted)).

8

¶ 20. In this case, however, we do not defer to the Commissioner. Although the Legislature has entrusted the Commissioner with administering the workers' compensation program, we have recognized that agencies generally do not have any special expertise in determining whether a statute applies retroactively. See Windham Cty. Sheriff's Dep't v. Dep't of Labor, 2013 VT 88, ¶ 6, 195 Vt. 1, 86 A.3d 410. In addition, the Legislature clearly did not entrust the Commissioner with deciding whether the 2014 amendment to § 644(a)(6) applies retroactively. As the Commissioner acknowledged, the 2014 amendment "was part of a broader legislative action to remove outdated and offensive terminology from all the Vermont statutes," and in the purpose statement of Act 96, the Legislature expressly stated that it did not intend "to alter the substance or effect of existing law or judicial precedent." Based on this express statement of legislative intent, the Legislature did not entrust the Commissioner with deciding whether the 2014 amendment to § 644(a)(6) applies retroactively. We accordingly do not defer to the Commissioner's decision on retroactivity.

## B. Statement of Legislative Intent

¶ 21. West argues that the Commissioner failed to give proper consideration to the Legislature's express statement that the 2014 amendment did not change existing law. Relying on basic principles of statutory interpretation, the Commissioner concluded that the 2014 amendment was substantive. Although the Commissioner acknowledged that the "Legislature's stated intent was not to change the substance of existing law," she explained that "words by their very nature have meaning and effect." The Commissioner concluded that the Legislature unintentionally changed the substance of § 644(a)(6) by replacing the term "imbecility" with "severe cognitive disability" and adding the words "physical disability."

¶ 22. West argues that the Commissioner violated the most basic principle of statutory interpretation, which is to give effect to the Legislature's intent, and that the Legislature made its intent clear in the purpose statement of Act 96, which provides that "nothing in this act shall be

9

construed to alter the substance or effect of existing law or judicial precedent." 2013, No. 96 (Adj. Sess.), § 1. North Branch argues, however, that notwithstanding the Legislature's statement of intent, the 2014 amendment substantively changed § 644(a)(6). We conclude that the Legislature's statement of intent in Act 96 is entitled to consideration but is not binding or conclusive on the question of whether the 2014 amendment to § 644(a)(6) applies retroactively.

¶ 23. The Legislature undoubtedly "may clarify the meaning of an earlier version of [a] statute." State v. Aubuchon, 2014 VT 12, ¶ 17, 195 Vt. 571, 90 A.3d 914. The only question is whether the amendment applies prospectively or retroactively, which, as outlined above, depends on whether an amendment clarifies or changes existing law. A clarifying enactment that "contravenes a construction placed on the original statute by the judiciary" cannot be applied retroactively because "when a court of last resort construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law." Id. ¶¶ 16-18 (quotations omitted). Any subsequent amendment therefore "changes the law; it does not merely state what the law always was." Id. ¶ 16 (quotation omitted).

¶ 24. By contrast, "if courts have not yet finally and conclusively interpreted a statute," the Legislature "may define the meaning of statutory language by enacting new law." Id. ¶ 18; see also McClung v. Emp. Dev. Dep't, 99 P.3d 1015, 1020 (Cal. 2004) ("The Legislature may define the meaning of statutory language by a present legislative enactment . . . ."). But because interpreting statutes is a judicial task, not a legislative one, the Legislature's "mere labeling of a new law as a clarification of existing law does not make it so." Aubuchon, 2014 VT 12, ¶¶ 18, 22. Accordingly, a subsequent legislative enactment declaring " 'what an earlier Legislature intended is entitled to consideration,' but is not binding or conclusive as to the statute's meaning." Id. ¶ 18 (quoting McClung, 99 P.3d at 1019-20); see, e.g., In re Shantee Point, Inc., 174 Vt. 248, 258, 811 A.2d 1243, 1251 (2002) ("The amendments to the ordinance can be interpreted as clarifications adopted in light of this litigation, rather than substantive changes."); Elkins v. Microsoft Corp.,

10

174 Vt. 328, 337-38, 817 A.2d 9, 17-18 (2002) (concluding that statutory amendment "was a clarification" of existing law "based on the plain meaning of the statute, the expressly stated legislative intent, the remedial purposes of the Act, our previous decisions construing the [Act], and the express legislative purpose behind the . . . amendment").

¶ 25. In re D.K. provides a useful illustration of these principles. In that case, the question was whether a statute "creating jurisdiction and detailed procedures for the family division in the first instance (and potentially the criminal division upon transfer from the family division) to adjudicate charges against adult defendants for offenses allegedly committed when they were juveniles" applied retroactively. 2012 VT 23, ¶ 6, 191 Vt. 328, 47 A.3d 347. The first section of the act creating the statute provided that the act clarified, "as the general assembly had always intended, that under the proper circumstances and for serious offenses, the state may bring charges against a person 18 years of age or older who committed a crime before turning 18." Id. ¶ 7 (quotation omitted). Citing this statement of legislative intent, the State argued "that the Legislature had always intended defendants to be subject to criminal prosecution for crimes committed while they were children." Id. ¶ 5.

¶ 26. We disagreed. Although we acknowledged that a "Legislature's statement of its intent is always of interest to this Court"—and that the Legislature "took pains to describe its actions as a clarification of its prior intent"—we explained that "our review must be based on the substantive analysis of the statutory amendment." Id. ¶ 8. Examining the statutory language, we concluded that the amendment could not "be considered merely a clarification" of existing law because the new statute "created an entirely new jurisdictional statute providing procedures . . . where none existed before." Id. ¶ 9.

¶ 27. Here, when the Legislature amended § 644(a)(6) in 2014, it expressly described the amendment as a clarification of the incurable imbecility or insanity standard. In the purpose statement accompanying Act 96, it explained that the "[c]hanges in terminology made in this act

11

[were] merely meant to reflect evolving attitudes towards persons with disabilities," not to "alter the substance or effect of existing law or judicial precedent." 2013, No. 96 (Adj. Sess.), § 1(b). Because we never interpreted the pre-amendment version of § 644(a)(6), the Legislature's declaration that the 2014 amendment was a clarification of what incurable imbecility or insanity always meant is "entitled to consideration." Aubuchon, 2014 VT 12, ¶ 18 (quotation omitted); Fleury v. Kessel/Duff Constr. Co., 148 Vt. 415, 419, 533 A.2d 1197, 1200-01 (1987) (declining to determine whether claimant was disabled under § 644(a)(6) because evidence indicated claimant was "totally disabled under any definition"). In sum, while our ultimate conclusion on the retroactive effect of the 2014 amendment to § 644(a)(6) must be based on a "substantive analysis of the statutory amendment," In re D.K., 2012 VT 23, ¶ 8, our analysis is informed by the Legislature's express statement that it intended the 2014 amendment to § 644(a)(6) to rephrase existing law in more respectful terms.

## C. Remedial or Substantive

¶ 28. Guided by the Legislature's express statement of intent, we hold that the 2014 amendment to § 644(a)(6)—defining total and permanent disability as "an injury to the skull resulting in several traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities"—applies retroactively because it is a remedial change. While the Commissioner is correct that imbecility historically meant a condition defined by a diminished IQ, courts interpreting that term in the workers' compensation context have adopted a distinct functional meaning. The 2014 amendment to § 644(a)(6) is entirely consistent with the functional definitions of imbecility and insanity that several courts have used in the workers' compensation context. See Microsoft Corp., 174 Vt. at 337-38, 817 A.2d at 17-18 (concluding that statutory amendment was clarification of existing law based on, among other things, "the expressly stated legislative intent" and "previous decisions construing the [act]").

12

## 1. Imbecility

¶ 29.   The term imbecility "can be traced to the now-repudiated eugenics movement of the late-nineteenth to mid-twentieth century," which "was a social movement that sought to control human heredity." Chamul v. Amerisure Mut. Ins. Co., 486 S.W.3d 116, 121 (Tex. App. 2016). To differentiate between levels of intellectual deficits, Henry Herbert Goddard, a prominent eugenicist, "created a three-tier system for classifying 'feeble-minded' individuals' cognitive abilities": idiots, who had an IQ of twenty-five or below; imbeciles, who had an IQ between twenty-five and fifty, which is equivalent to a mental age of between three and seven years; and morons, who had an IQ between fifty and seventy-five, which is a mental age between eight and twelve years. Id. Today, these terms—idiots, imbeciles, and morons—have been replaced with "somewhat overlapping standards" to evaluate intellectual disability. Wimp, 360 P.3d at 1105-06.

¶ 30.   During the twentieth century, states began using the term imbecility in their workers' compensation statutes to define total and permanent disability. See, e.g., Savich v. Indus. Comm'n, 5 P.2d 779, 780 (Ariz. 1931) (citing statutory definition of total disability, which included "an injury to the skull resulting in incurable imbecility or insanity"); Wimp, 360 P.3d at 1104 (noting that the term imbecility appeared in "Kansas workers-compensation law in 1917"); Liptak v. Indus. Accident Comm'n of Cal., 251 P. 635, 635 (Cal. 1926) (explaining that Workmen's Compensation, Insurance and Safety Act of 1917 defined permanent disability in part as "injury to the brain resulting in incurable imbecility or insanity"); see also Mich. Comp. Laws Ann. § 418.361(3)(f) (defining "[t]otal and permanent disability" in part as "[i]ncurable insanity or imbecility"); Tex. Labor Code Ann. § 408.161(a)(6) (providing that "[l]ifetime income benefits" will be paid for "a physically traumatic injury to the brain resulting in incurable insanity or imbecility").

¶ 31.   Despite being included in state workers' compensation statutes for almost a hundred years, there are only a handful of courts that have interpreted the phrase incurable

13

imbecility. Of these courts, some states—like Michigan, Virginia, and Texas—have rejected the historical meaning of imbecile and instead adopted a functional meaning of the term consistent with the purposes of their workers' compensation laws. Other states, however, like Kansas, have focused on the historical meaning of imbecility.

¶ 32. In Redfern v. Sparks-Withington Co., 268 N.W.2d 28, 34 (Mich. 1978), the Michigan Supreme Court adopted a functional meaning of the term imbecility under its workers' compensation statute. In that case, one of the claimants fell from a scaffold and fractured his skull, which caused numerous behavioral problems that "radically changed" his life. Id. at 31, n.4. Claimant's clinical psychologist rated him as "mentally defective to borderline normal intelligence" with an IQ of around seventy-three. Id. The Worker's Compensation Appeal Board determined that the claimant did not meet his burden of proving he was an imbecile suffering from a diminished IQ.

¶ 33. On appeal, the Michigan Supreme Court rejected an IQ-based definition of imbecility, explaining that it sought a definition of "imbecility that serve[d] the policies of the worker's disability compensation act." Id. at 33-34. The Court reasoned that imbecility was included in the general category of "[d]evasting specific losses" that are deemed to cause "total and permanent disability," like losing the use of both legs or sight of both eyes. Id. at 35. It accordingly concluded that the "legislative purpose was to provide compensation for severe . . . cognitive loss comparable in its impact on the quality of the personal, non-vocational life of the worker to the loss of two [limbs] or sight of both eyes." Id. Consistent with this purpose, the Court defined incurable imbecility as "severe cognitive dysfunction," which is dysfunction that "affects the quality of the worker's personal, non-vocational life in significant activity comparable to the loss of two [limbs] or sight of both eyes." Id. at 37.

¶ 34. About ten years later, a Virginia appeals court adopted a similar definition of imbecility. In Barnett v. D.L. Bromwell, Inc., 366 S.E.2d 271 (Va. Ct. App. 1988) (en banc), the

14

claimant was knocked unconscious for about three hours after a fireplace door hit her in the head. Following the injury, the claimant suffered from "permanent expressive aphasia (loss of power of spoken or written expression), dyslexia (inability to read understandingly), dysgraphia (inability to write), and hemi-hypoesthesis (abnormally decreased acuteness of sensation on one side of the body)." Id. at 272. Although the worker's compensation board affirmed the deputy commissioner's finding that the claimant had "suffered permanent irreversible brain damage which [had] seriously reduced her capacity to engage in many usual cognitive processes," the board concluded that she had not established she was suffering from incurable imbecility. Id. Citing the historical understanding of imbecility, the board explained that the claimant failed to establish she had an IQ between twenty-five and forty-nine.

¶ 35. On appeal, the Virginia Court of Appeals adopted a functional definition of imbecility. It rejected the employer's contention that the term imbecile had a plain medical meaning because the record established "that the term 'imbecile' ha[d] not been used in the medical profession for approximately twenty-five years." Id. at 272-73. Because the court found that the term was ambiguous, it interpreted imbecile in light of the "functional purpose" of the Worker's Compensation Act and adopted a "non-technical meaning" of imbecility—"an irreversible brain injury which renders the employee permanently unemployable and so affects the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes." Id. at 36.

¶ 36. More recently, a Texas appeals court followed Virginia and Michigan in rejecting an IQ-based understanding of imbecility. Chamul, 486 S.W.3d 116. In Chamul, the claimant fell ten feet from a scaffold onto a concrete slab, causing him to suffer a serious head injury. Over the next several years, the claimant was evaluated by several doctors, including one appointed by the Worker's Compensation Division, who opined that the claimant functioned "at the level of an 11 or 12 year-old, [was] unable to care for himself, and [would] need a caretaker for the rest of his

15

life." Id. at 118-19. The Worker's Compensation Division concluded that the claimant was not entitled to benefits because an imbecile is someone with a mental age of three to seven years and there was no evidence that claimant was in that mental age range. The Texas Court of Appeals—after engaging in an extensive discussion of the history of the term imbecility and Virginia's and Michigan's functional interpretations of the term—rejected the narrow IQ-based definition. It reasoned that the IQ-based definition would lead to absurd results, and that a broader understanding of the term imbecile was consistent with dictionary definitions and the purpose of the Texas Worker's Compensation Act. Without adopting a specific definition, the court remanded to the agency. Id. at 125-28.

¶ 37.    While Michigan, Virginia, and Texas have rejected IQ-based definitions of imbecility, a Kansas appeals court recently adopted an IQ-based definition. Wimp, 360 P.3d 1100. In Wimp, the court explained that when the word imbecility was added to Kansas' workers' compensation law in 1917, it had a "defined meaning." Id. at 1105. Citing the twentieth-century distinctions between idiots, imbeciles, and morons, the court explained that imbecile referred to a person with an IQ between twenty-five and fifty. Id. at 1104-05. Applying this IQ-based definition of imbecile, the court concluded that claimant was not suffering from incurable imbecility because he had an IQ of eighty-six and graduated from high school.

### 2. Insanity

¶ 38.    Insanity throughout the mid-to-late nineteenth century was typically understood as a medical term, referring to a mental disease causing an unsound mind. See Haile's Curator v. Texas & P. Ry. Co., 60 F. 557, 560 (5th Cir. 1894) ("According to the great current of modern medical authorities, insanity is a disease[]—a disease of the mind . . . ."); Johnson v. Maine & N.B. Ins. Co., 22 A. 107, 108 (Me. 1891) ("Etymologically, insanity signifies unsoundness; lexically, it signifies unsoundness of mind, or derangement of the intellect. Medical science, with its usual zeal, has deeply investigated the various forms, symptoms, causes, results, and manifestations of

16

mental unsoundness or disease . . . ."); <u>McNeil v. S. Tier Masonic Relief Ass'n</u>, 58 N.Y.S. 119, 122 (App. Div. 1899) ("Insanity is a mental disease, and also implies disease or congenital defect in the brain."). By the early 1900s, however, insanity was generally abandoned as a medical term. See <u>Insanity</u>, Stedman's Medical Dictionary (2014) (explaining that insanity is "[a]n outmoded term referring to severe mental illness or psychosis"); J. Tighe, "<u>What's in a Name?": A brief Foray into the History of Insanity in England and the United States</u>, 33 J. Am. Acad. of Psychiatry & the L. 252, 255-56 (2005) (explaining that psychiatrists in the twentieth century wanted to "stamp out" the use of the word insanity in the medical and psychiatric context and pointing to the 1920s and 1930s as a "crucial turning point[]").

¶ 39.    As outlined above, <u>supra</u>, ¶ 30, around the same time, the word insanity began appearing in states' workers' compensation statutes as a way to define total disability. The parties identify two cases interpreting the term incurable insanity in the workers' compensation context: one from Michigan and another from Texas. While Michigan adopted a functional definition of insanity, Texas defined insanity in terms of psychosis, which is the modern understanding of the term insanity.

¶ 40.    In <u>Redfern</u>, the Michigan Supreme Court declined to equate insanity with its modern medical equivalent—psychosis—explaining that there was "no consensus regarding the meaning of that medical term." 268 N.W.2d at 36. The Court also concluded that "[d]efinitions of insanity developed in other areas of the law [were] not helpful":

> A worker may know right from wrong (a criminal test), but be unable to function in a normal social setting, just as there are criminally insane persons who for long periods of time function normally in society. Similarly, a person may have the mental capacity to stand trial, to contract, to execute a will, and yet be unable to function in normal society or vice versa. While for purposes of involuntary commitment, evidence of danger to himself and others . . . may be an appropriate test and clearly would indicate severe social dysfunction, it is too restrictive for the purposes of the act to require evidence that the mental illness poses a risk of physical harm.

Id. Instead, keeping in mind the purpose of the Worker's Disability Compensation Act, the Court adopted a functional definition of insanity, concluding that insanity means severe social dysfunction, which it defined as dysfunction that "affect[s] the quality of the worker's personal, non-vocational life in significant activity comparably to the loss of two [limbs] or sight of both eyes." Id. at 37.

¶ 41.    Two decades later, a Texas appeals court took a different approach. In National Union Fire Insurance Co. v. Burnett, 968 S.W.2d 950 (Tex. App. 1998), the claimant, a sales clerk at Wal-Mart, fell while on a storeroom ladder. Over the next few months, the claimant saw several physicians about various ailments, including migraine headaches, depression, memory defects, and suicidal thoughts. The trial court concluded that the claimant suffered from incurable insanity because, it reasoned, there is a correlation between a head injury and development of depression, and based on the way the claimant fell, she must have hit her head.

¶ 42.    On appeal, the claimant asked the court to adopt a functional, nontechnical definition of insanity and conclude that she was incurably insane in part because she had "severe depression and cognitive defects in concentration, memory, and judgment." Id. at 956. The court declined to do so, explaining that the phrase "incurable insanity" had been in the worker's compensation statute since 1917, despite numerous amendments to the statute since that time. While the court recognized that insanity is no longer a term in the medical community, it explained that "the term 'psychosis' is now used in lieu of what was formerly termed as 'insanity.' " Id. at 954. Citing the 1994 version of the Diagnostic and Statistical Manual of Mental Disorders, the court explained that symptoms of psychotic disorder include "delusions, hallucinations, disorganized speech, incoherence, or grossly disorganized or catatonic behavior." Id. Based on the modern definition of psychosis, the court concluded that the claimant was not insane.

18

### 3. Analysis

¶ 43. Considering how courts have interpreted the terms imbecility and insanity in the workers' compensation context—and guided by the Legislature's express statement that 2014 amendment to § 644(a)(6) did not change substantive law—we conclude that the 2014 amendment amounts to a remedial change that can be applied retroactively. While the Commissioner is correct that imbecility historically referred to an adult with a severely diminished IQ—and at least one court has adopted that definition in the workers' compensation context—that alone does not indicate that the 2014 amendment amounts to a substantive change. A broader reading of case law indicates that the language of the 2014 amendment—"an injury to the skull resulting in severe traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities"—is consistent with several states' functional understanding of the terms imbecility and insanity.

¶ 44. As outlined above, courts in Michigan, Virginia, and Texas have rejected technical and medical definitions of imbecility and insanity and instead adopted functional definitions, which focus on how an injury affects a worker's psychiatric and cognitive functioning. Redfern, 268 N.W.2d at 37 (defining imbecility as "severe cognitive dysfunction" and insanity as "severe social dysfunction"); Chamul, 486 S.W.3d at 128 (rejecting IQ-based definition of incurable imbecility because it did not reflect "the understanding of the term when it was incorporated into the legislation, is overly narrow, and would lead to absurd results"); Barnett, 366 S.E.2d at 274 (concluding that Legislature intended term imbecility to have "non-technical meaning," which it defined as irreversible brain injury rendering "the employee permanently unemployable" and affecting "the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes").

¶ 45. In amending § 644(a)(6) to be more respectful towards persons with disabilities, the Legislature followed the approach taken by these courts and adopted a functional definition of

19

incurable imbecility or insanity that focuses on how injuries to the brain affect cognitive, physical, and psychiatric functioning. In fact, the Michigan Supreme Court's definitions of imbecility and insanity from 1978 are substantially similar to Vermont's 2014 amendment to § 644(a)(6). Compare Redfern, 268 N.W.2d at 37 (defining imbecility as "severe cognitive dysfunction" and insanity as "severe social dysfunction"), with 2013, No. 96 (Adj. Sess.), § 137 (replacing "incurable imbecility or insanity" with "severe traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities").

¶ 46. North Branch nonetheless argues, as the Commissioner noted below, that the introduction of the term "physical disabilities" in the 2014 amendment creates a significant change because that term has no corresponding antecedent in the pre-amendment version. While it is true that the pre-amendment version of § 664(a)(6) did not use the term "physical disabilities," the 2014 amendment still amounts to a remedial change. Courts that have adopted functional definitions of imbecility and insanity have in part relied upon physical disability to determine that claimants were suffering from incurable imbecility or insanity. Consistent with providing a modern articulation of the incurable imbecility and insanity standard, the 2014 amendment to § 644(a)(6) makes explicit that severe brain injuries may result in physical disabilities.

¶ 47. In adopting a functional definition of incurable imbecility or insanity—severe cognitive or social dysfunction—the Michigan Supreme Court recognized that severe cognitive or social dysfunction may be demonstrated by physical manifestations. Redfern, 268 N.W.2d at 37 n.20 (explaining that because issue on appeal was "the severity or work-relatedness of the worker's condition," it was not necessary to define mental illness, but suggesting that "an organic disorder affecting the brain or nervous system and resulting in physical manifestations, e.g., epilepsy" might "constitute 'mental illness' or give rise to 'social dysfunction' "); Modreski v. Gen. Motors Corp. v. Fisher Body Div., 337 N.W.2d 231, 236 & n.8 (Mich. 1983) (recognizing that "an organic disorder affecting the brain or nervous system and resulting in physical manifestations" or "a

20

psychotic disorder resulting in physical manifestations might constitute mental illness or give rise to social dysfunction" (quotation omitted)). Similarly, in concluding that a claimant suffered from incurably imbecility under its functional definition, the Virginia Court of Appeals relied in part on the physical manifestations of the claimant's injury, explaining that following her work-related injury claimant suffered from "permanent expressive aphasia (loss of power of spoken or written expression)" and "hemi-hypoesthesis (abnormally decreased acuteness of sensation on one side of the body)." Barnett, 366 S.E.2d at 272, 274.

¶ 48.    Finally, we presume that the Legislature makes "changes in the law in light of the relevant decisions of this Court." State v. Messier, 2005 VT 98, ¶ 10, 178 Vt. 412, 885 A.2d 1193 (quotation omitted). While we have never defined incurable imbecility or insanity under the pre-amendment version of § 644(a)(6), our decision in Fluery v. Kessel/Duff Construction Co. supports the conclusion that the 2014 amendment to § 644(a)(6), and its inclusion of physical disabilities, is a remedial change because it adopts a functional definition of the incurable imbecility or insanity standard. In Fluery, the claimant fell fifteen feet after being struck in the head with a timber. The fall left claimant with numerous permanent physical impairments, including double vision, vertigo, moderately severe hearing loss in both ears, "organic brain syndrome, cervical motion restriction, and psychoneurosis anxiety reaction." The Commissioner determined that claimant was impaired under the "functional equivalent of 'incurable imbecility or insanity.' " Although we noted on appeal that prior case law suggested the Commissioner's "functional equivalent of 'incurable imbecility or insanity' " reasoning was "appropriate," we affirmed on different grounds, concluding that claimant was totally disabled under any definition of permanent and total disability. 148 Vt. at 419, 533 A.2d at 1200. Our implicit endorsement of the Commissioner's functional-equivalent analysis in Fleury further supports our conclusion that the 2014 amendment to § 644(a)(6) is a remedial change.

¶ 49. In sum—guided by the Legislature's statement of intent in Act 96 and based on how courts have interpreted the terms imbecility and insanity in the workers' compensation context—we conclude that the 2014 amendment to § 644(a)(6) is a non-substantive, remedial change. The amendment is a modern, more respectful articulation of the incurable imbecility or insanity standard that is consistent with the functional definitions of imbecility and insanity that several courts have adopted, including the Michigan Supreme Court, the Virginia Court of Appeals, and the Texas Court of Appeals. Our conclusion, however, is limited to the issue of whether § 644(a)(6) applies retroactively. Because the Legislature has entrusted the Commissioner with the "administration of the workers' compensation laws," Wallis, 2003 VT 103, ¶ 14, we will leave the Commissioner with the task on remand of further interpreting § 644(a)(6) to determine the appropriate standards to apply to determine whether a claimant is totally and permanently disabled, see Sargent v. Town of Randolph Fire Dep't, 2007 VT 56, ¶ 9, 182 Vt. 546, 928 A.2d 525 (mem.) ("We afford substantial deference to the Commissioner in reviewing the Commissioner's interpretation of the workers' compensation statute.").

## II. Alternative Grounds for Affirmance

¶ 50. Notwithstanding our conclusion that the 2014 amendment to § 644(a)(6) applies retroactively, North Branch argues that we can affirm the Commissioner's summary-judgment decision on two alternative grounds. Alpine Haven Prop. Owners Ass'n, Inc. v. Deptula, 2003 VT 51, ¶ 10, 175 Vt. 559, 830 A.2d 78 (mem.) (recognizing that Court may affirm "grant of summary judgment on alternate grounds" supported by record). First, North Branch argues that West waived his right to benefits under § 644(a)(6) by asking the Commissioner to grant summary judgment in its favor. Second, North Branch asserts that based on the summary-judgment record, West is not permanently and totally disabled under any definition outlined in § 644, especially subsection (a)(6).

22

¶ 51.     We conclude that West has not waived his right to benefits under § 644(a)(6).  In addition, because we are not ultimately determining the applicable standards under § 644(a)(6), and disputed facts remain about the scope of West's impairment, we cannot affirm under the theory that West is not permanently and totally disabled under any definition of permanent disability.

## A.  Waiver

¶ 52.     North Branch argues that West has waived his right to benefits under § 644(a)(6) because in asking the Commissioner to grant summary judgment in North Branch's favor, he admitted, and the Commissioner determined, that he could not make out a prima facie case for total and permanent disability.  Waiver is the "intentional relinquishment or abandonment of a known right."  United States v. Olano, 507 U.S. 725, 733 (1993) (quotation omitted).  A party may "waive virtually any right, constitutional or statutory, as long as the waiver is knowing, intelligent, and voluntary."  State v. Hance, 157 Vt. 222, 224, 596 A.2d 365, 366 (1991).  Considering the procedural history of this case, and West's motion for summary judgment, we conclude that West has not waived his right to benefits under § 644(a)(6).

¶ 53.     Following the Commissioner's June 2019 summary-judgment ruling concluding that the 2014 amendment to § 644(a)(6) did not apply retroactively, West filed a motion for interlocutory appeal.  Although the Commissioner granted the motion under Vermont Rule of Appellate Procedure 5, we disagreed that West's appeal satisfied those criteria and dismissed the appeal.  Thereafter, West filed his motion for summary judgment in North Branch's favor, explaining that he did not want to proceed under the pre-amendment version of § 644(a)(6) because the terms imbecile and insanity were vague, ambiguous, offensive, and disrespectful to persons with disabilities.  He accordingly requested that the Commissioner enter final judgment for North Branch, but only to the extent that the pre-amendment version of § 644(a)(6) applied to his claim, so that he could appeal the Commissioner's June 2019 summary-judgment ruling.

¶ 54.    In response, North Branch argued that West's concerns over the offensive nature of the pre-amendment version of § 644(a)(6) were not a sufficient basis to grant summary judgment.  Consistent with the summary-judgment standard, North Branch argued that summary judgment could only be granted if West conceded or the Commissioner determined that West could not prevail on his claim for benefits under § 644(a)(6) as a matter of law.  Accordingly, North Branch requested that the Commissioner conclude that West was not disabled under either version of § 644(a)(6) based on Dr. Hebben's February 2020 IME.  In his reply, West argued that because he was conceding that he could not make a prima facie case under the pre-amendment version of § 644(a)(6), Dr. Hebben's report was irrelevant.  In September 2020, the Commissioner granted summary judgment on the basis that West conceded he could not make a prime facie case under the pre-amendment version of § 644(a)(6).

¶ 55.    The record is exceedingly clear that although West took the unusual step of asking for summary judgment in North Branch's favor, he did not waive his right to benefits under § 644(a)(6).  Since the Commissioner's June 2019 summary-judgment ruling, West has maintained the position that he does not want to proceed under the pre-amendment version of § 644(a)(6) because he finds the terms imbecility and insanity highly offensive and disrespectful.  He first moved to take an interlocutory appeal, and when what that was denied, he specifically asked for summary judgment, but only to the extent that the pre-amendment version of § 644(a)(6) applied to his claim.  Given that the Legislature expressly sought to cultivate "a culture of respect towards persons with disabilities" by amending § 644(a)(6), 2013, No. 96 (Adj Sess.), § 1, and West has consistently expressed his desire to proceed under the more respectful 2014 standard, we conclude that West has not waived his right to benefits under § 644(a)(6).

## B. Merits of Disability Claim

¶ 56.    North Branch also argues that based on the summary-judgment record, West is not totally and permanently disabled under any definition in § 644, including subsection (a)(6). Specifically, North Branch asserts that West is not disabled because he is gainfully employed. In addition, North Branch argues that the deposition testimony of West's medical expert, Dr. Kandel, is insufficient to demonstrate that West is permanently and totally disabled under § 644(a)(6). We do not affirm on this basis for two reasons.

¶ 57.    First, the fact that West is presently employed is not as legally significant as North Branch suggests. Total and permanent disability under § 644(a) is not based on a claimant's ability to work. Bishop v. Town of Barre, 140 Vt. 564, 571, 442 A.2d 50, 53 (1982) ("[P]ermanent disability benefits are calculated solely on the basis of physical impairment . . . regardless of loss of present earning power." (quotation omitted)). While the Department of Labor promulgated a rule requiring that claimants proceeding under § 644(b) demonstrate inability to achieve regular, gainful employment, no such rule exists for claims under § 644(a). See Permanent Partial Disability, Permanent Total Disability and Death Benefits Rule 10.1700, Code of Vt. Rules 24 010 003, http://www.lexisnexis.com/hottopics/codeofvtrules. Furthermore, while North Branch is correct that some courts' functional definitions of imbecility and insanity consider a claimant's ability to work, our conclusion is limited to the issue of whether § 644(a)(6) applies retroactively. Compare Barnett, 366 S.E.2d at 274 (defining imbecility as irreversible brain injury rendering "the employee permanently unemployable" and affecting "the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes"), with Redfern, 268 N.W.2d at 34 (concluding that "it would not be consonant with the design of the [workers' compensation] act to regard wage earning capacity as determinative of entitlement to total and permanent disability benefits for incurable insanity and imbecility"). We leave the Commissioner

with the task on remand of providing the appropriate standards to determine whether a claimant is permanently disabled under § 644(a)(6).

¶ 58. Second, disputed facts remain about the exact scope of West's impairment. Although North Branch cites Dr. Hebben's opinion that "under no definition" of which she was aware "does West suffer from incurable imbecility or insanity," West cites to Dr. Kandel's September 2018 deposition testimony that "West suffered an injury to the skull resulting in a severe traumatic brain injury causing permanent and severe cognitive, physical, or psychiatric disabilities." These competing expert opinions present the exact type of factual dispute that is not appropriate for resolution at the summary-judgment stage. See Pierce v. Riggs, 149 Vt. 136, 139-40, 540 A.2d 655, 657 (1987) ("[I]t is not for the trial judge to adjudicate who is more credible, plaintiff or defendants and their affiants, in the context of a motion for summary judgment.").

Reversed and remanded.

FOR THE COURT:

---

Associate Justice

26